KERRY JENNIFER SCROGGINS,

     Plaintiff,

v.                                     Civil Action No. 3:22-cv-545-MHL

LEXISNEXIS RISK SOLUTIONS FL INC.

     Defendant.

## SECOND AMENDED CLASS ACTION COMPLAINT

COMES NOW the Plaintiff, **KERRY JENNIFER SCROGGINS** (hereafter "Plaintiff" or "Ms. Scroggins"), individually and on behalf of a class of similarly situated consumers, by Counsel, and as for her Second Amended Complaint against **LEXISNEXIS RISK SOLUTIONS FL INC.** ("Defendant" or "LexisNexis") states as follows:

### PRELIMINARY STATEMENT

1.     This is an action for statutory, actual, and punitive damages, costs, and attorney's fees for Defendant's violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681a–x ("FCRA").

2.     LexisNexis cannot credibly argue that it is exempted from the FCRA. Defendant collects consumer data through a shared process with LexisNexis Risk Solutions, Inc. ("LNRS") and other related entities, some of which acknowledge FCRA-governance. This LexisNexis group collects data in a single process and that collection is made in whole or in part for the furnishing of consumer reports governed by the FCRA. Defendant sells the data for FCRA governed

purposes. It purchases consumer credit reporting data from conventional CRA like Equifax, TransUnion and Experian and integrates these into its own products.

3.     LexisNexis violated 15 U.S.C. §1681e(b) when it—on multiple occasions—falsely and erroneously reported Plaintiff as deceased based on the consumer report data it purchased from Experian and/or TransUnion. Defendant sold this false information even though it had access to more reliable sources of such information, including the Social Security Administration's Death Master File, which would have confirmed the inaccuracy. Plaintiff brings this §1681e(b) claim on a class action basis on behalf of other consumers who are alive today, but were reported deceased by LexisNexis.

4.     Because consumers may only confront consumer report inaccuracies if they are aware of them, 15 U.S.C. § 1681g(a) requires that Defendant provide not only "all information," but also "the sources of the information" in the consumer's file, and a comprehensive list of everyone, including end-users, to whom the Defendant has provided a report about the consumer. 15 U.S.C. § 1681g(a)(1)–(3). Defendant violated § 1681g(a) because it failed to provide Plaintiff and numerous other consumers with "all information" regarding Defendant's deceased notation about them, the sources of this deceased notation, or a list of everyone to whom Defendant provided a report about them with a deceased notation.

5.     Plaintiff brings this §1681g claim on a class action basis on behalf of other consumers who requested and were refused a copy of their FCRA-mandated file disclosure, which has an economic value at an amount greater than $12.50.

6.     Despite numerous disputes from Plaintiff to Defendant, LexisNexis violated 15 U.S.C. §1681i when it refused to conduct a substantive investigation of her disputes and then

continued to report Plaintiff as deceased to Call Federal Credit Union, preventing her from accessing vital account and banking services.

## JURISDICTION AND VENUE

7.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

8.     Venue is proper in this District as Plaintiff is a resident in this District and Division, the violations described in this Complaint occurred in this District and Division, and the Defendant transacts business within this District and Division.

## PARTIES

9.     The Plaintiff is a natural person residing in New Kent County, Virginia and at all times relevant to the Complaint was a "consumer" as defined by 15 U.S.C. § 1681a(c).

10.     Defendant is foreign corporation authorized to do business in Virginia through its registered office in Henrico County, Virginia.

11.     Defendant is "a consumer reporting agency" as defined by 15 U.S.C. § 1681a(f).

## FACTUAL ALLEGATIONS

### *Defendant is a Consumer Reporting Agency because it sells reports containing data collected in whole or in part for use in whole or in part for an FCRA purpose.*

12.     "Congress passed the Fair Credit Reporting Act (FCRA) in response to concerns about data brokers assembling detailed dossiers about consumers and selling this information to those making employment, credit, and other decisions. People often have little choice about whether to enter into business relationships with these companies or whether they will be tracked, yet the data these companies collect may nevertheless play a decisive role in significant life decisions, like buying a home or finding a job. The FCRA provides a range of protections,

including accuracy standards, dispute rights, and restrictions on how data can be used. The law covers data brokers like credit reporting companies and background screening firms, as well as those who report information to these firms." *CFPB launches inquiry into the business practices of Data Broker*s (Mar. 15, 2023) Consumer Financial Protection Bureau, available at https://www.consumerfinance.gov/about-us/newsroom/cfpb-launches-inquiry-into-the-business-practices-of-data-brokers/ (last accessed on June 22, 2023).

13. Defendant is just the type of governed data seller and consumer reporting agency (CRA) under the FCRA to which the CFPB refers. It collects, maintains, warehouses, parses, and sells reports about consumers that include data collected in whole or in part for an FCRA-governed purpose. Still, LexisNexis contends (falsely) that it never acts as a CRA.

14. Defendant and its affiliates have operated in the consumer reporting business for decades, and now claim to "help tens of thousands of customers and hundreds of thousands of individual users be prepared to manage change and meet their growing risk management challenges."[1]

15. Defendant markets itself to a diverse group of potential customers, including those in the financial services, collections, and recovery industries, government, and law enforcement, to name a few.[2]

16. LexisNexis sells a large menu of reporting products, but two basic workflows make up the primary reports it claims are not FCRA governed: LexisNexis® InstantID® and Accurint®.

17. Defendant has created Instant ID as a reporting tool that allows its customers – expressly including financial services customers - to make decisions about consumers. It explains

---

[1] https://risk.lexisnexis.com/our-technology (last accessed on Oct. 26, 2022).

[2] https://risk.lexisnexis.com/ (last accessed on Oct. 26, 2022).

on its website, "LexisNexis® InstantID® provides robust identity coverage that helps increase verification rates and support informed decisions to help your business."[3]

18.     LexisNexis boasts that its Instant ID product is created from "the industry's most robust database" and empowers its customers to "instantly connect to aggregate information from over 83 billion public and proprietary records that cover 95% of the U.S. adult population, including entities with limited credit and financial histories."[4]

19.     LexisNexis® Accurint® is another major reporting product sold by Defendant. It is marketed for different purposes and industries, but as with its FCRA and Instant ID products, LexisNexis claims that the Accurint "workflow combines the power of robust LexisNexis® data with leading proprietary linking technology to help you find people and businesses in a click" and "[q]uickly get access to public and proprietary data from thousands of proven sources delivered in a concise, rank-ordered output."[5]

20.     Both Instant ID and Accurint (as well as numerous other variations of reports selling the same data) are sold in an integrated way alongside reporting products Defendant acknowledges are FCRA-governed.  For example, on the same website providing Instant ID, Defendant offers other products for its "Financial Services" customers titled, "Credit Risk Assessment", a product it explains is for the purpose of "Improv[ing] Credit Decisions With an Expanded View of Risk" and stating, "Every lender is different, but many struggle with similar challenges: How — and when — to extend more competitive offers and approve a wider range of

---

[3] https://risk.lexisnexis.com/products/instantid (last accessed November 9, 2023).

[4] *Id.*

[5] https://risk.lexisnexis.com/products/accurint-for-collections---contact-and-locate-workflow (last accessed November 9, 2023).

credit applicants while managing risk exposure. Traditional methods of credit risk decisioning can leave valuable pieces of the picture out of view. It's time to rethink the data and insights your lending organization uses to assess creditworthiness."[6]

21.     Similarly, on the same website for Instant ID and Accurint, Defendant sells, "LexisNexis® Accurint® for Collections", which it describes as a "Decisioning Workflow [that] delivers seamless access to FCRA-regulated data sets and key searches to help you determine ability to repay and prioritize accounts to increase collections success."[7]

22.     LexisNexis sells consumer reports to financial institutions like credit unions for use in determining whether consumers like Plaintiff meet the terms of the account. The consumer reports LexisNexis sold about Plaintiff to Call Federal determined whether Plaintiff maintained access to services for her bank account and whether she could be approved for an increase in her debit card daily spending limit, and even whether show or anyone could review her account for credit options.

23.     Defendant acknowledges that LexisNexis Risk group sells various other products it acknowledges to be FCRA governed.  It sells insurance underwriting reports – C.L.U.E. reports.[8] And its affiliates sell tenant screening and even public records credit reports, all of which they acknowledge are FCRA-governed.

---

[6] https://risk.lexisnexis.com/financial-services/credit-risk-assessment (last accessed November 9, 2023).

[7] https://risk.lexisnexis.com/products/accurint-for-collections-decisioning-workflow (last accessed November 9, 2023).

[8] https://risk.lexisnexis.com/products/clue-auto (last accessed November 9, 2023).

24.     LexisNexis Risk Solutions FL Inc. – Defendant – also contracts with various customers to sell acknowledged FCRA products as its own – sometimes as a disclosed reseller CRA and other times undisclosed.

25.     The named Defendant contracts with various states – Utah, Florida and Washington by example only.  The Utah contract, like the others is solely with Defendant:



Contract #: MA2316

## STATE OF UTAH COOPERATIVE CONTRACT

1.  CONTRACTING PARTIES:  This contract is between the Utah Division of Purchasing and the following Contractor:

| LexisNexis Risk Solutions FL Inc. | | |
|---|---|---|
| *Name* | | |
| 1000 Alderman Dr. | | |
| *Street Address* | | |
| Alpharetta | Georgia | 30005 |
| *City* | *State* | *Zip* |

Vendor # VC0000191276   Commodity Code #: 95635   Legal Status of Contractor: For-Profit Corporation

Contact *Name:* GAURANG DAVE   *Phone Number:* +1 202-378-1018   *Email:* gaurang.dave@lnssi.com

2.  CONTRACT PORTFOLIO NAME: Risk Solution Services.

26.     Defendant's arguments in this case are remarkable given that it openly contracts to sell what IT ITSELF labels "FCRA" data right alongside its sale of reporting products it claims are not FCRA governed.  For example, in the product list for these contracts with LexisNexis Risk Solutions FL Inc., Defendant sells various products it claims are non-FCRA, while also selling products such as:

| Batch FCRA Solutions | Price Per |
|---|---|
| **Derogatory And Deceased -- Banko** | **Input** |
| Bankruptcy (Flag) | $0.01 |
| Bankruptcy (Short) | $0.01 |
| Bankruptcy (Short) Monitor | $0.01 |
| Bankruptcy (Full Record) | $0.02 |
| Bankruptcy Monitor (Full Record) | $0.01 |
| Banko Events Monitoring | $0.50 |
| Deceased (Flag) | $0.01 |
| Deceased | $0.01 |
| Deceased Monitor | $0.01 |

and

| A4GC FCRA Transactional Feature | PRICE |
|---|---|
| Bankruptcy Search (charged per search) | $0.25 |
| Bankruptcy Report | $1.00 |
| Concealed Weapons Permit | $0.25 |
| Criminal Records (charged per search) | $1.00 |
| Criminal Records Report | $1.00 |
| Equifax Recovery Report (FCRA) | $0.65 |
| FAA Aircraft (Report Included) (not discountable) | $0.25 |
| FAA Pilots (Report Included) (not discountable) | $0.25 |
| Federal Firearms & Explosives (not discountable) | $0.25 |
| Hunting/Fishing Licenses (not discountable) | $0.25 |
| Judgments & Liens (charged per search) (not discountable) | $0.25 |
| Judgments & Liens Report | $1.00 |
| Marriages / Divorces Search | $1.00 |

and even

| | |
|---|---|
| Sexual Offender Alerts (Available in A4LE+, A4Gov+) | 15 alerts = $15.00/user/month |
| | 30 alerts = $27.00/user/month |
| | 60 alerts = $45/user/month |
| Equifax Credit Reports (FCRA) (Available in A4Gov) | $2.25 per search |
| Credit Report – Single (FCRA, for employment purposes only) (Available in A4Gov) | $6.00 per report |
| Credit Report – BiMerge (FCRA, for employment purposes only) (Available in A4Gov) | $12.00 per report |
| Credit Report – TriMerge (FCRA, for employment purposes only) (Available in A4Gov) | $17.00 per report |

27.     Defendant summarizes its available databases to include all of this common "FCRA" data (in this partial excerpted list):

The depth and breadth of the content within the LexisNexis Risk Solutions (LNRS) database includes billions of public and proprietary records from over 10,000 sources including credit headers from three credit bureaus. The database includes generally:

- People locators
- Associates
- Bankruptcy information
- Business Information
- Civil Courts
- Concealed Weapons Permit
- Corporation Filings
- Criminal Records
- DEA Controlled Substances Licenses
- Death Records
- Driver Licenses
- Email Search
- FAA Aircraft
- FAA Pilots
- Federal Criminal Court Records Search
- Federal Firearms & Explosives Licenses
- Federal Employer ID Numbers (FEIN)
- Fictitious Business Name
- Foreclosures Search
- Hunting/Fishing Licenses
- Liens & Judgments
- Marriages / Divorces Search
- Motor Vehicles Search/Report
- MVR Wildcard Search
- National Council for Prescription Drug Programs
- National UCC Filings
- Neighbors
- Official Records Search
- Passport Validation
- People At Work
- Person Alerts Monitoring
- Professional Licenses
- Property Assessment Search
- Property Assessment Report
- Property Deed Search

28. Defendant and its affiliates have tried to create a corporate structure to assign "ownership" of products into different named entities. However, it collects all of this data one time – data it collects with the expectation that it will be used for both its FCRA and non-FCRA products. It then duplicates the exact same collected data into different silos. That is its basis for claiming that it can sell one Accurint product as FCRA-governed and a different Accurint product as non-FCRA governed.

29. Even with this contrived separation, Defendant still links all of its data across entities, products and silos to a single assigned "LexId." A consumer's data in a siloed non-FCRA database is assigned the same LexId as that duplicated copy of data in the FCRA database.

30.     LexisNexis describes this process: "Patented, Exclusive, Linking Technology leverages a unique identifier LexID that provides a single identified numeric number that links all data for an individual and a business. The linking process compiles and easily identifies all the details around a single identity providing greater confidence that the data associated is for the correct person or business. Given a few pieces of information (e.g. a phonetically spelled name, the city of a previous address), LexID technology can rapidly retrieve a complete and accurate identification of an individual, including current and historical addresses as well as associative links (relatives, associates, and neighbors)."

31.     Even LexisNexis' consumer tasks are all integrated. LexisNexis has testified in this case that its Consumer Care Portal – the department every LexisNexis entity uses for consumer disputes and file disclosure requests – is "agnostic" as to whether it is investigating a dispute or providing a disclosure to a consumer.

32.     Also relevant here, LexisNexis purchases by individual contracts consumer data from credit reporting agencies TransUnion and Experian, which these companies have themselves collected from creditors reporting tradelines. Specifically for this case, these credit bureaus sell data collected from the "Equal Credit Opportunity Act" ("ECOA") field used by creditors to report whether a consumer is single vs. a co-obligor vs. an authorized user, as well as whether the creditor has received information that the consumer may be deceased.

33.     LNRS agreed to purchase consumer reports from Experian and TransUnion which contained deceased indicators pertaining to specific consumers. LNRS obtained authority from these admitted CRAs to share these consumer reports with its affiliates, including LexisNexis.

34.     To perpetuate the fiction that deceased indicators fall outside the coverage of the FCRA, LNRS, Experian, and TransUnion referred to the consumer reports purchased by LNRS as

"credit header data" or "consumer indicative information," not consumer reports. "Credit header data" consists of "the name, address, social security number, and phone number of [a] consumer." *Individual Reference Servs. Grp., Inc. v. F.T.C.*, 145 F. Supp. 2d 6, 17 (D.D.C. 2001), *aff'd sub nom. Trans Union LLC v. F.T.C.*, 295 F.3d 42 (D.C. Cir. 2002). The Federal Trade Commission (FTC) previously stated that "[a] report limited to identifying information such as a consumer's name, address, former addresses, or phone number, does not constitute a 'consumer report' if it does not bear on any of the seven factors and is not used to determine eligibility." Fed. Tr. Comm'n, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT (July 2011), at 21.[9] A deceased indicator obtained by a CRA from an ECOA Code furnished by a creditor cannot be characterized as "credit header data" outside the ambit of the FCRA. No regulator or Court has ever found that a deceased indicator constitutes "credit header data." Numerous courts have found that inaccurately reporting consumers as deceased is governed by and violates the FCRA's protections.[10]

---

[9] Available at https://www.ftc.gov/sites/default/files/documents/reports/40–years–experience–fair–credit–reporting–act–ftc–staff–report–summary–interpretations/110720fcrareport.pdf. Notably, the U.S. Court of Appeals for the District of Columbia Circuit, in *dicta*, strongly indicated that consumer addresses may in fact constitute consumer reports in certain circumstances. *Trans Union Corp. v. F.T.C.*, 245 F.3d 809, 816 (D.C. Cir. 2001) (questioning FTC's conclusion that P.O. Box address information does not bear on one of the seven factors encompassed by the definition of "consumer report" in § 1681a(d)(1) but finding it unnecessary to resolve the question to reach its decision).

[10] *See, e.g.*, *Groettum v. Kohl's Dep't Stores, Inc*., 2020 WL 788945 (D. Minn. Feb. 18, 2020); *Estate of Rennick v. Universal Credit Servs., L.L.C.*, 2019 WL 196539 (E.D. Pa. Jan. 15, 2019); *Thompson v. Equifax Info. Serv., L.L.C.*, 2018 WL 1381135 (E.D. Pa. Mar. 19, 2018); *Howell v. Equifax Info. Serv., L.L.C.*, 2017 WL 76892 (E.D. Mo. Jan. 9, 2017); *Waletzko vs. Corelogic Credco, L.L.C.*, 2016 WL 5879597 (W.D. Wis. Oct. 7, 2016); *Noori v. Bank of Am*., 2016 WL 3124628 (C.D. Cal. May 26, 2016); *Sheldon v. Experian Info. Sols., Inc.*, 2010 WL 3768362 (E.D. Pa. Sept. 28, 2010); *Perez v. Trans Union, L.L.C.*, 526 F. Supp. 2d 504 (E.D. Pa. 2007); *Gohman v. Equifax Info. Serv., L.L.C.*, 395 F. Supp. 2d 822 (D. Minn. 2005); *Schmitt v. Chase Manhattan Bank*, 2005 WL 2030483 (D. Minn. Aug. 23, 2005); *Anderson v. Trans Union, L.L.C.*, 345 F. Supp. 2d 963 (W.D. Wis. 2004).

35.     As the FCRA sets forth, a consumer report is:

> Any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (A) credit or insurance to be used primarily for personal, family, or household purposes; (B) employment purposes; or (C) any other purpose authorized under section 1681b of this title.

15 U.S.C. § 1681a(d).

36.     FTC guidance has long held that including part of a tradeline within the name and address credit header report makes it a consumer report:

> A list of consumers' names and addresses, if assembled or defined by reference to characteristics or other information that is also used (even in part) in eligibility decisions, is a series of consumer reports. For example, a list comprised solely of consumer names and addresses, but compiled based on the criterion that every name on the list has at least one active trade line, updated within six months, is a series of consumer reports.

40 YEARS OF EXPERIENCE WITH THE FCRA at 21. In *Trans Union Corp. v. F.T.C.*, which reviewed the FTC's Order requiring TransUnion to cease from selling consumer reports for target marketing purposes, the D.C. Circuit found "substantial record evidence supports the Commission's finding that" the "mere existence of a tradeline is a 'factor in credit-granting decisions.'" *Id.* at 816 (quoting *Trans Union Corp. v. F.T.C.*, 81 F.3d 228, 233 (D.C. Cir. 1996)).

37.     The "used or expected to be used or collected in whole or in part" clause of § 1681a(d) "incorporates three distinct concepts: ultimate use, expectation of use, and reason for compilation" and communicated information falling within "any one of the clause's components" constitutes a "consumer report," so long as it bears on one of the seven factors in § 1681a(d). *Yang v. Gov't Emps. Ins. Co.*, 146 F.3d 1320, 1324-25 (11th Cir. 1998); *see also Comeaux v. Brown & Williamson Tobacco Co.*, 915 F.2d 1264, 1273-74 (9th Cir. 1990) ("The plain language of section

1681a(d) reveals that a credit report will be construed as a 'consumer report' under the FCRA if the credit bureau providing the information expects the user to use the report for a purpose permissible under the FCRA, without regard to the ultimate purpose to which the report is actually put."); *Ippolito v. WNS, Inc.*, 864 F.2d 440, 449 n.10 (7th Cir. 1988) ("Because of the circular definition of 'consumer report,' § 1681b's limitations on the dissemination of consumer reports are essentially rendered meaningless if the…determination of whether a report is a consumer report is made solely by looking at the reason for which the report is requested").

38.     The law has long been that the specific use to be made of a specific report is not relevant to the question of whether or not the data generally was FCRA-governed.  Plaintiff called Defendant to dispute the deceased reporting, only to be told to submit proof of her identification and a current bill and that an investigation would take up to forty (40) to sixty (60) days to complete. *Bakker v. McKinnon*, 152 F.3d 1007 (8th Cir. 1998) stated:

> We hold that, regardless of appellant's intended use of the credit reports, these reports are consumer reports within the meaning of the FCRA because the information contained therein was collected for a consumer purpose. Under the FCRA whether a credit report is a consumer report does not depend solely upon the ultimate use to which the information contained therein is put, but instead, it is governed by the purpose for which the information was originally collected in whole or in part by the consumer reporting agency.

39.     Identifying a consumer as "deceased" bears on her "credit worthiness, credit standing, credit capacity, [and] general reputation" because the dead lack any credit worthiness, credit standing, and credit capacity and most, if not all, businesses view the deceased moniker as an indicator of fraud and, after seeing it attached to the file of someone who applies for an account or account services, will refuse to deem "deceased" consumer eligible for any account (credit or otherwise) or account services. Further, no employer will hire an employee identified as deceased, and government agencies will not grant licenses or other benefits to deceased individuals.

40. The *Credit Reporting Resource Guide* ("CDIA Resource Guide") refers to the ECOA Code as "defin[ing] the relationship of the primary consumer to the account and designates the account as joint, individual, etc., in compliance with the Equal Credit Opportunity Act." Consumer Data Industry Association, *Credit Reporting Resource Guide*, Field Definitions, 4-20 (2020).[11] Data furnishers generally use the Metro 2 Format when reporting account information to CRAs. The CDIA Resource Guide highlights features of the Metro 2 Format, including:

> Accepted by all consumer reporting agencies, the Metro 2 Format enables the reporting of accurate, complete and timely credit information.
>
> Meets all requirements of the Fair Credit Billing Act (FCBA), the Fair Credit Reporting Act (FCRA), the Equal Credit Opportunity Act (ECOA) and all applicable state laws.
> Allows credit information to be added and mapped to the consumer's file with greater consistency.
>
> Allows complete identification to be reported to each consumer (including co-debtor, co-signer, etc.) each month which improves the ability of the consumer reporting systems to match to the correct consumer….
>
> Reporting in the Metro 2 Format greatly benefits the credit grantor, the consumer reporting agencies and your customer, the consumer.

*Id.* at Automated Data Reporting, 2-1.

41. It is beyond dispute that Experian and TransUnion operate as CRAs. As reflected in the CDIA Resource Guide, Experian and TransUnion obtain consumer reporting data, like deceased indicators, because "credit grantors and consumer depend on consumer reporting agencies to acquire and maintain accurate credit histories." CDIA Resource Guide at 1-1.

---

[11] The Consumer Data Industry Association, "[a]n international trade association representing the consumer credit, mortgage reporting, employment and tenant screening and collection service industries," publishes the CDIA Resource Guide to help "provider[s] of consumer data understand[] the tools that are available and adhere[] to the standards for credit reporting." *Id.* at Responsibilities and Roles, 1-1, 1-2.

42. Defendant knew, for years before reporting Plaintiff as deceased, that the information purchased from Experian and TransUnion containing deceased indicators as to specific consumers constituted consumer report data governed by the FCRA.

43. Defendant "collected" the consumer reports obtained from Experian and TransUnion, "in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility" for credit, insurance, employment purposes, or one or more of the permissible purposes listed in § 1681b.

44. Nothing in the FCRA allowed Defendant to transmute deceased indicators tied to specific consumers, i.e., consumer reports, "collected" in whole or in part for consumer reporting purposes by Experian and TransUnion, into "credit header data" outside the ambit of the FCRA. FTC guidance makes this clear:

> INCORPORATION OF INFORMATION FROM PRIOR CONSUMER REPORTS
> If information from a consumer report is added to a report that is not otherwise a consumer report, that report becomes a consumer report.
>
> REPORT CONCERNING A *"CONSUMER'S"* ATTRIBUTES AND HISTORY
> A report from a CRA on the personal credit of a consumer to a business credit grantor is a "consumer report" regardless of the purpose for which the information may in fact be used. Reports obtained from CRAs on consumers retain their character as "consumer reports" even if they are subsequently furnished in connection with a commercial credit or insurance transaction.

40 YEARS OF EXPERIENCE WITH THE FCRA at 20-21.

45. Defendant knowingly purchased consumer report data from Experian and Trans Union containing deceased indicators pertaining to specific consumers.

46. Even assuming the FCRA somehow permitted the transmutation of "consumer reports" Defendant purchased from Experian and TransUnion into non-FCRA data, Defendant nonetheless sells "consumer reports" to its customers because these customers regularly use the

information purchased from Defendant for various permissible purposes, as delineated by § 1681a(d)(1).

47. LexisNexis claims (falsely) that it never acts as a CRA and instead enters into agreements with numerous financial institutions and other entities purporting to sell "Non-FCRA LN Services."[12] LexisNexis publishes Master Terms and Conditions (the "Master Terms") for these agreements on the "LexisNexis Risk Solutions" website. *LexisNexis Master Terms and Conditions*, available at https://risk.lexisnexis.com/masterterms (last accessed on June 22, 2023).

48. Despite language purportedly prohibiting the use of LexisNexis information for FCRA purposes, the Master Terms specifically contemplate that LexisNexis's customers will use such information for FCRA permissible purposes, as reflected in the chart below.

| Permitted Use Language | Applicable FCRA Permissible Purpose(s) |
|---|---|
| "[T]o verify or authenticate an individual's identity" | **§ 1681b(a)(3)(A)**: to use the information in connection with a credit transaction involving the consumer on whom the information to be furnished and involving the…collection of an account of, the consumer.<br><br>**§ 1681b(a)(3)(F)**: in connection with a business transaction that is initiated by the consumer or to review an account to determine |

---

[12] Mere disclaimers in the context of knowing otherwise are not meaningful. *See e.g. In re Filiquarian Publishing, L.L.C.*, No. C-4401 (F.T.C. Apr. 30, 2013) (final decision and order) (companies that clearly promoted background reports, available through mobile applications, for use in employment screening, but included disclaimers purporting to state that reports should not be considered screening products for insurance, credit, or employment purposes, were not in compliance with FCRA); s*ee also Abdallah v. LexisNexis Risk Sols. Inc*., 2021 WL 1209419, at *6 (E.D.N.Y. Mar. 30, 2021) (rejecting argument that disclaimer on its website saying that it is not CRA was enough to warrant dismissal); *United States v. MyLife.com, Inc*., 499 F. Supp. 3d 757, 765 (C.D. Cal. 2020) (mere presence of certain disclaimers did not warrant dismissal of FCRA claims).

| | whether the consumer continues to meet the terms of the account[13] |
|---|---|
| "[T]o prevent or detect fraud or other unlawful activity" | **§ 1681b(a)(3)(A)**: to use the information in connection with a credit transaction involving the consumer on whom the information to be furnished and involving the…collection of an account of, the consumer.<br><br>**§ 1681b(a)(3)(F)**: in connection with a business transaction that is initiated by the consumer or to review an account to determine whether the consumer continues to meet the terms of the account[14] |
| "[T]o determine whether to buy or sell consumer debt or a portfolio of consumer debt in a commercial secondary market transaction, provided that such determination does not constitute in whole or in part, a determination of an individual consumer's eligibility for credit or insurance to be used primarily for personal, family or household purposes" | **§ 1681b(a)(3)(E)**: to use the information, as a potential investor…in connection with a valuation of, or an assessment of the credit or prepayment risks associated with, an existing credit obligation |
| "[T]o identify, locate, or contact a consumer in connection with the collection of a consumer's debt or for prioritizing collection activities"[15] | **§ 1681b(a)(3)(A)**: to use the information in connection with a credit transaction involving the consumer on whom the information to be |

---

[13] As but one example, financial institutions prohibit consumers with a deceased marker from using banking services on existing non-credit accounts, e.g., online transfers or debit card purchases on a checking account.

[14] Fraud prevention at a financial institution necessarily entails prohibiting suspected fraudsters from accessing account services to which a legitimate customer is otherwise entitled. § 1681b(a)(3)(F)(i) "provides a permissible purpose to obtain a consumer report on a consumer for use in connection with a transaction from which he or she might expect to receive a benefit," other than credit, employment, or insurance, "where the report user has a legitimate business need for the information." 40 YEARS OF EXPERIENCE WITH THE FCRA at 48. § 1681b(a)(3)(F)(ii) also "provides a permissible purpose to banks that have a legitimate business need to consult a current customer's consumer report in order to determine whether the terms of a consumer's current non-credit (savings or checking) accounts should be modified." *Id.*

[15] Corporate affiliates of LexisNexis, to resolve a class action in this Court, agreed, through an Injunctive Relief Order, to treat certain information provided to credit originators and debt collectors "as meeting the FCRA's definition of a consumer report." *Berry, et al. v. LexisNexis Risk & Information Analytics Group, Inc., et al.*, No. 3:11-cv-754, ECF No. 131, Page ID# 3781 (E.D. Va. Sept. 5, 2014). Although this obligation has now expired, use of LexisNexis's information "for prioritizing collection activities" falls within the scope of the Injunctive Relief

| | furnished and involving the…collection of an account of, the consumer. |

49.     The Master Terms specifically authorize uses of LexisNexis reports for FCRA purposes. Using these reports to "determine whether to buy…consumer debt…or a portfolio of consumer debt in a commercial secondary market transaction" falls squarely within the coverage of § 1681b(a)(3)(E).

50.     Likewise, Courts have long held that reports issued to a user for collection purposes fall within the coverage of § 1681b(a)(3)(A). *Huertas v. Galaxy Asset Mgmt.*, 641 F.3d 28, 34 (3d Cir. 2011) ("the statute expressly permits distribution of a consumer report to an entity that 'intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, *or review or collection of an account of, the consumer.*'"); *Korotki v. Thomas, Ronald & Cooper, P.A.*, 131 F.3d 135 (4th Cir. 1997) (Defendant "was seeking to collect an account owed by the consumer, § 1681(b)(3)(A), likewise a permissible purpose"); *Cooper v. Pressler & Pressler, LLP*, 912 F. Supp. 2d 178, 188 (D.N.J. 2012) ("Capital One could rightfully obtain a copy of Plaintiff's consumer report from a CRA in order to review, or collect upon, Plaintiff's MasterCard credit card account.").

51.     Meanwhile, LNRS acknowledges that it is a CRA: "FCRA Services. If a Customer desires to use a product described in a Schedule A as an FCRA product, Customer will execute an FCRA Addendum to the Master Terms. The FCRA product will be delivered by an Affiliate of LNRSFL, LexisNexis Risk Solutions Inc., in accordance with the terms and conditions of the Master Terms." *Master Terms* at 2(v); *see also Banko Events Monitoring*, available at https://risk.lexisnexis.com/products/banko-events-monitoring (last accessed on June 22, 2023)

_____

Order requiring LexisNexis' corporate affiliates to treat such information as a consumer report under the FCRA.

("Banko® is a consumer reporting agency product provided by LexisNexis Risk Solutions and is fully compliant with the Fair Credit Reporting Act, 15 U.S.C. 1681, et seq."); *LexisNexis RiskView Solutions Brochure*, available at https://risk.lexisnexis.com/-/media/files/product%20pages/brochure/lnrs-riskview-solutions-overview-brochure-nxr12070-01-0322-en-us.pdf (last accessed on June 22, 2023) ("RiskView™ is a consumer reporting agency product provided by LexisNexis Risk Solutions Inc. and may only be accessed in compliance with the Fair Credit Reporting Act, 15 U.S.C. 1681, et seq.")

52. As the FCRA sets forth, a consumer reporting agency is:

[A]ny *person*[16] which, *for monetary fees*, dues, or on a cooperative nonprofit basis, *regularly engages* in whole or in part *in the practice of assembling* or evaluating consumer credit information or *other information on consumers for the purpose of furnishing consumer reports to third parties*, and which uses any means or facility *of interstate commerce for the purpose of preparing* or furnishing consumer reports.

15 U.S.C. § 1681a(f) (emphasis added).

53. As demonstrated above, Defendant operates as a CRA because (1) in exchange for compensation; (2) Defendant regularly assembles information on consumers; (3) for the purpose of furnishing consumer reports; and (4) by means of interstate commerce.

54. As to the first element, there is no dispute that Defendant receives compensation from its customers. Someone paying money to another in exchange for a product or service is the definition of "customer."

55. The term "consumer reporting agency that compiles and maintains files on consumers on a nationwide basis" means a consumer reporting agency that regularly engages in

---

[16] "Person" is defined as "any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity." 15 U.S.C. § 1681a(b).

the practice of assembling or evaluating, and maintaining, for the purpose of furnishing consumer reports to third parties bearing on a consumer's credit worthiness, credit standing, or credit capacity, each of the following regarding consumers residing nationwide: (1)Public record information, (2)Credit account information from persons who furnish that information regularly and in the ordinary course of business. Defendant itself does this, but certainly even more clearly, collectively, LexisNexis Risk Management Group operates as a "consumer reporting agency that compiles and maintains files on consumers on a nationwide basis." 15 U.S.C. §1681p.

56.     Efforts by a consumer reporting agency to "circumvent or evade treatment as a 'consumer reporting agency that compiles and maintains files on consumers on a nationwide basis, as defined under section 603(p) of the FCRA, 15 U.S.C. 1681a(p)" is legally ineffective including by "Corporate organization, reorganization, structure, or restructuring[.]" 12 C.F.R Part 1022.

57.     This was a core purpose for more the FCRA's update, as the Legislative History explained: "The FTC is directed to prescribe regulations preventing consumer reporting agencies from avoiding being treated as an agency defined in section 603(p) by manipulating their corporate structure or consumer records in a manner that allows them to operate with essentially identical activities but for a technical difference." Statement by Rep Oxley, Cong. Rec. E2514 (Extension of Remarks Dec. , 2003).

58.     The first example the CFPB offers of prohibited and ineffective circumvention pf FCRA-governance through corporate structure is the exact one attempted by Defendant – structuring entities by data type – one housing the FCRA business and the other claimed non-FCRA business:

> Circumvention through reorganization by data type. XYZ Inc. is a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis. It restructures its operations so that public record information is assembled and maintained only by its corporate affiliate, ABC Inc. XYZ continues operating

as a consumer reporting agency but ceases to comply with the FCRA obligations of a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis, asserting that it no longer meets the definition found in FCRA section 603(p), because it no longer maintains public record information. XYZ's conduct is a circumvention or evasion of treatment as a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis, and thus violates this section.

Id.

59.     LexisNexis collects, maintains and then parses consumer reporting information from Experian and TransUnion, actively curating the records to match—in LexisNexis's own view—the request information provided by the customer. LexisNexis's customers do not merely search for specific records, but instead ask a general question: "Is this customer with specific personal identifying information deceased?" Because the information obtained from Experian and TransUnion often does not match or does not provide sufficient information to match records, LexisNexis affirmatively sorts, manipulates, and infers information to adapt data results to the requests received.

60.     LexisNexis collects and then parses consumer reporting information from Experian and TransUnion and a wide range of other sources to provide consumer reports to its customers, as acknowledged in its marketing materials.

61.     LexisNexis enters into contracts with financial institutions and other businesses which expressly provide that these customers may use the information provided under these contracts for purposes governed by the FCRA. Further, LexisNexis receives disputes from consumers on a regular basis confirming that its reports are used by its customers for permissible purposes described by the FCRA.

62.     Defendant had actual knowledge that its customers use the website and Defendant's data for FCRA purposes.

*LexisNexis Unreasonably Reported Plaintiff as Deceased in Multiple Consumer Reports*

63. As pertinent here, LexisNexis sold multiple consumer reports to Call Federal identifying Plaintiff as "deceased." The "deceased" reporting LexisNexis sold to Call Federal originated from consumer reports LexisNexis obtained from Experian and/or TransUnion.

64. Defendant receives deceased information from roughly 25 different sources, and most of its deceased records come from presumptively reliable government sources such as the SSA and state governments

65. While no data set will be 100% perfect, the SSA and state government databases are the most reliable sources of deceased records.

66. If a consumer is reported deceased by a non-governmental source, it is presumptively suspicious and unreliable if a private source thereafter reports a conflicting record of deceased.

67. Here, Defendant accepted and reports a deceased indicator about the Plaintiff it obtained and collected from private sources that contradicted the governmental data.

68. Defendant should have understood this contradiction as an anomaly and conducted further investigation before it reported a deceased record about a consumer that the government agencies reported was not deceased.

69. In fact, had Defendant applied the same matching procedures to the deceased data that it applied for FCRA-governed report, the Defendant's FCRA rules would have prohibited its reporting in the Plaintiff's reports.

70. Identifying Plaintiff as "deceased" bore on her "credit worthiness, credit standing, credit capacity, [and] general reputation" because being reported with a deceased marker is the ultimate statement that you lack any credit worthiness, credit standing, and credit capacity and

most, if not all, creditors view the deceased moniker as an indicator of fraud and, after seeing it attached to the file of someone who applies for an account or account services, will refuse to deem a "deceased" consumer eligible for any account (credit or otherwise) or account services. 15 U.S.C. § 1681a(d)(1).

71.     In fact, this is "[o]ne of the worst types of inconsistent file cases" where "the reporting of a live consumer as deceased" occurs "by entering a value of 'X' in the "ECOA" field otherwise used to report an account as a joint obligation or as an authorized user account" and "results in the entire file essentially shutting down[.]" National Consumer Law Center, FAIR CREDIT REPORTING (10th ed. 2022), updated at www.nclc.org/library, 4.4.6.3.3 *Reporting living consumers as deceased*.

72.     LexisNexis knows that when it reports a consumer as "deceased" to a credit union, the credit union will use that information "as a factor in establishing the consumer's eligibility for…credit or insurance to be used primarily for personal, family, or household purposes." *Id.*

73.     LexisNexis knows that reporting a consumer as "deceased" to a prospective creditor like a credit union effectively precludes that consumer from obtaining credit sought by the consumer.

74.     LexisNexis knows that when it reports a consumer as "deceased" to a credit union, the credit union will use that information for a purpose governed by the FCRA.

75.     LexisNexis' own website confirms this knowledge because it advertises that InstantID® as a tool to prevent and detect identity theft. Any financial institution which identifies a "deceased" notation as an indicator of fraud will necessarily include that information "as a factor in establishing the consumer's eligibility for…credit." 15 U.S.C. § 1681a(d)(1).

76.     On or about April 29, 2021, Plaintiff contacted Call Federal to inquire about an auto loan to purchase a used car.

77.     On or about May 20, 2021, Plaintiff encountered difficulty accessing her online banking with Call Federal because she changed her phone number. She could not receive the passcode necessary to access online banking because it was going to her old phone number. Plaintiff's online banking afforded her access to numerous services pertaining to her loan account and checking account with Call Federal, including online payments and transfers, payment assistance, digital wallets, and mobile deposit capture.[17] Plaintiff called Call Federal to attempt to rectify this situation, but she was advised of Defendant's "deceased" reporting and prohibited from accessing any account services. Call Federal provided Plaintiff with a telephone number to reach Defendant.

78.     Online banking services provide a channel for consumers to access credit and its connected financial services: "[c]onsumers are using mobile financial services (MFS)—financial services and products accessed through mobile phones and other devices—more and more to access accounts, pay bills, deposit funds and manage their financial lives." CFPB, *Mobile Financial Services*, 3 (Nov. 2015), available at https://files.consumerfinance.gov/f/201511_cfpb_mobile-financial-services.pdf. These services save consumers time, money, and fees. *Id.* at 46.

---

[17] Call Federal's standard Membership and Account Agreement states, in part" "[y]ou authorize us to check your account, credit and employment history, and obtain reports from third parties, including credit reporting agencies, to verify your eligibility for the accounts and services you request." *Membership and Account Agreement*, available at https://callfederal.org/wp-content/uploads/2017/05/Membership-and-Account-Agreement.pdf (last accessed on June 22, 2023).

79.     Congress enacted the FCRA, in part, "to…promote the efficiency of the nation's banking…system[]." 40 YEARS OF EXPERIENCE WITH THE FCRA at 1.

80.     Call Federal used Defendant's consumer reports "to determine whether the terms of [Plaintiff's]…checking account[s] should be modified." Defendant knew that Call Federal and other bank and credit union customers would use Defendant's consumer reports to determine whether consumers maintained full access to their checking and savings accounts.

81.     Because Defendant's reporting precluded Plaintiff from accessing any services from Call Federal online or over the phone, Plaintiff drove miles to a Call Federal branch to prove that she was alive and update her telephone number.

82.     Plaintiff is not deceased. The Social Security Administration Death Master File did not and does not include Plaintiff's Social Security number as that of a deceased person.

83.     In May 2021, Plaintiff was denied access to banking services with Call Federal based on the false "deceased" notation contained in the consumer report compiled and supplied by Defendant to Call Federal.

84.     On or about October 29, 2021, Plaintiff contacted Call Federal by phone to increase the purchase limit on her debit card so she could make a $5,000.00 payment for a home improvement purchase. Plaintiff sought to use make a debit card payment using the "credit" feature, which runs the debit payment through a credit card network like Visa.[18] Plaintiff asked Call Federal to provide a preauthorization of the $5,000.00 payment, but Call Federal would not note this preauthorization without verifying her via InstantID®. Because InstantID® reported Plaintiff as "deceased," Call Federal refused Plaintiff's requested debit card preauthorization.

---

[18] This is still a debit card transaction, but the cardholder may receive certain benefits like zero liability for fraudulent purchases by selecting the "credit" feature.

85.     On or about October 29, 2021, Defendant through its Customer Care Portal responded that it had received and was reviewing Plaintiff's dispute and supporting documentation.

86.     Plaintiff again called Call Federal on or about November 15, 2021 because she was unable to access mobile banking, and Defendant again reported to Call Federal that Plaintiff was "deceased."

87.     Plaintiff contacted Call Federal by phone on or about March 23, 2022. Defendant again reported Plaintiff as "deceased."

88.     On or about June 21, 2022, Plaintiff again contacted Call Federal after she unsuccessfully attempted to initiate an Apple Pay transaction using her Call Federal checking account. Call Federal sent Plaintiff a text message "fraud alert" in connection with this attempted transaction. Call Federal restricted Plaintiff from using her debit card based on the "fraud alert." Initially, the Call Federal representative could not remove the debit card restriction because Defendant furnished another report identifying Plaintiff as "deceased." After Plaintiff sent a secure message to Call Federal through the online banking portal, the Call Federal representative succeeded in removing the debit card restriction.

89.     Plaintiff noted again that she is not deceased and that she submitted paperwork back in May 2021 evidencing she is not deceased.

### *Defendant Refused to Reasonably Investigate and Correct When Plaintiff Disputed the Deceased Reporting*

90.     Plaintiff called Defendant[19] to dispute the deceased reporting, only to be told to submit proof of her identification and a current bill and that an investigation would take up to forty (40) to sixty (60) days to complete.

91.     Shortly thereafter, Plaintiff submitted a dispute to Defendant via its online Customer Care Portal[20] to contest Defendant's inaccurate reporting of her as deceased. She included in her dispute a copy of her driver license and Social Security card.

92.     Despite Plaintiff's online dispute in May 2021 and the very clear evidence that she is alive and not deceased, Defendant continued to report her to Call Federal as deceased.

93.     On or about November 2, 2021, LexisNexis responded to Plaintiff via email, advising her to contact the LexisNexis Consumer Center by telephone.

94.     On or about November 4, 2021, Plaintiff called LexisNexis's Consumer Center and spoke with two overseas representatives, "Elaine" and "Leo." These representatives claimed LexisNexis lacked necessary documentation to prove Plaintiff was not deceased. Plaintiff asked to speak with someone stateside due to a language barrier and was told LexisNexis would have someone call her, but no one ever called Plaintiff back.

95.     On or about February 28, 2022, Plaintiff submitted a letter via Certified Mail to LexisNexis to obtain a disclosure of her consumer file.

---

[19] The number provided to Plaintiff provides consumers access to contest reporting by "LexisNexis Risk Solutions," a conglomeration of entities, including LexisNexis, operated under the umbrella of RELX, "a global provider of information-based analytics and decision tools for professional and business customers, enabling them to make better decisions, get better results and be more productive." *RELX*, available at https://www.relx.com/ (last accessed on May 9, 2023). This conglomeration also encompasses third-party LNRS.

[20] Like the telephone number for Defendant provided to Plaintiff by Call Federal, the Customer Care Portal affords consumers access to dispute reporting and request disclosures from various affiliated entities operating as "LexisNexis Risk Solutions."

96.     On or about March 8, 2022, LexisNexis furnished a purported copy of Plaintiff's consumer file disclosure to Plaintiff. Plaintiff's "date of death" was reported as "0/0/0," ostensibly indicating that LexisNexis was no longer reporting Plaintiff as deceased.

97.     When LexisNexis provided Plaintiff her file disclosure, it wholly withheld any information pertaining to InstantID®.

98.     The consumer disclosure also did not contain a record of Call Federal's access of Plaintiff's consumer data via InstantID®.

99.     The LexisNexis disclosure does not contain all material information Defendant and its affiliates have linked to Plaintiff's LexId.

100.    After May 2021, Defendant knew that Plaintiff was not deceased and had firsthand knowledge of that fact because of her dispute. Thereafter, Plaintiff continued to provide evidence to Defendant that she was alive through disputes, telephone calls, and her request for a copy of her consumer report.

101.    Only the living typically request copies of their consumer reports.

### Defendant's Conduct was Willful

102.    There are numerous reasons why Defendant's FCRA violations were willful. Defendant has expressly admitted in discovery that: "LNRS FL does not have procedures to comply with sections 1681e(b), 1681g(a), or 1681i of the FCRA."

103.    Defendant refused to correct the reporting of the Plaintiff as deceased until sued. Plaintiff spent months disputing inaccurate information within her consumer file with Defendant and endured substantial hardship because of LexisNexis' failure to report accurate information within Plaintiff's consumer file. This is evidence of willfulness. *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142 (4th Cir. 2008).

104.    Defendant has been sued in federal court by consumers alleging that it violated the FCRA by inaccurately reporting information without following reasonable procedures to assure that the information it sold about consumers was maximally accurate.

105.    In fact, Defendant has been sued multiple times by consumers in federal class actions cases – including in this Court in *Berry* - and has still to correct its FCRA violations.

106.    The CFPB has also published guidance that companies such as Defendant would be FCRA-governed.

107.    The FCRA and Regulation V (CFPB) prohibit the attempted use of corporate structures to avoid FCRA governance.

108.    Defendant has placed all of its bets on one defense – that its copying of the same data collected at least in part for a FCRA purpose into two versions allows one to avoid FCRA governance.

109.    This theory and strategy began early – before 2006 – in LexisNexis' corporate development.  Early on, the idea was described in different internal discussions.  For example, the theory was pitched as follows:



# Same Information, Different Use

- ACCURINT:
  - Uses bankruptcy, crim/sex pred data
  - Is not an FCRA product
  - Cannot be used for FCRA "eligibility purposes" (or it will turn into a duck)

- "SDS" products:
  - Will use bankruptcy, crim/sex pred and credit data
  - will be FCRA compliant
  - SDS data can ONLY be used for FCRA purposes (must stay in the pond)

110.    The restructuring idea was expressed at this pre-2007 period:

**1. Create a separate legal entity for the credit reporting products**

a) Assumption:  A separate Seisint corporate unit, with its own employees and database, will offer products regulated by the Fair Credit Reporting Act (FCRA).

i) This will satisfy the FCRA's "complete separation" requirement.

ii) Complete separation between Seisint's FCRA and non-FCRA operations will help prevent transforming Accurint and other existing products into consumer reports regulated by the FCRA.

b) Assumption:  The Seisint holding company will purchase data, then separately license the data to Seisint's FCRA and non-FCRA subsidiaries.

i) This should satisfy the requirement that Seisint's FCRA and non-FCRA units "separately obtain" the data, without forcing them to duplicate their data acquisition efforts.

ii) This approach is the approach used by Experian, which has both FCRA and non-FCRA operations.

111.    Yet even the compliance employees inside LexisNexis at that time understood that

this legal fiction was reckless, warning in internal communications:



# #1  Once a duck, always a duck!

- Once data is protected by the FCRA, it will always be protected by the FCRA
- Once data is used for an FCRA purpose, all subsequent use of that data must be FCRA compliant

# # 3  Anything that swims in the pond turns into a duck

If Seisint sells Accurint data for FCRA purposes, all of Accurint data from then on must then be FCRA compliant (taints all of Accurint)

112.    When LexisNexis created this "collect once, use twice" business model, it hired a

former FTC attorney, Helen Foster, as a compliance expert.

113.    On January 25, 2008, Ms. Foster testified that she left her position at LexisNexis

because it was ignoring her advice about this issue.

114.     The FCRA allows for a remedy for a "willful" violation.  A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007). A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

115.     Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by the Plaintiff" and a failure to make the correction right away. *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 418 (4th Cir. 2001); *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008). Further, a lack of any internal procedures to anticipate or prevent inaccuracy is willful. *Daugherty v. Ocwen Loan Servicing, LLC*, 701 F. App'x 246, 249–50 (4th Cir. 2017).

116.     As detailed above, the FCRA sections at issue here, and informative guidance, have been around now for over 50 years. The FCRA's caution of Defendant's "grave responsibilities" to ensure accuracy has not changed.

117.     None of these allegations are controversial.  LexisNexis has been scheming and strategizing around these challenges for well over twenty (20) years.  It has designed its corporate structures to place products it wants to avoid the FCRA is different company names, while at the same time operating as a single integrated agency.

118.     because Defendant is reporting them as "deceased."

119.     LexisNexis further knows that reporting a consumer as deceased is the most harmful notation that can be attached to one's consumer file. There is no more derogatory notation—not bankruptcy, foreclosure, or repossession—than reporting a consumer as deceased.

120.    Defendant is therefore aware that reporting a consumer as deceased is devastating to the consumer because it effectively halts the consumer's ability to engage in the financial services market.  Financial institutions view the "deceased" notation as indicative of fraud and will refuse to grant financial services of any kind to any customer identified as "deceased" by Defendant.

121.    Defendant has been on notice for years through consumer disputes and lawsuits that living consumers are unable to access financial services because Defendant is reporting them as "deceased."

122.    LexisNexis has received thousands of disputes from consumers complaining that their LexisNexis consumer reports have them erroneously marked as "deceased."

123.    LexisNexis knows that thousands of consumers are erroneously marked as "deceased" on their LexisNexis consumer reports, but said consumers are not on the Death Master File and are, in fact, alive.

124.    Nevertheless, LexisNexis employs no procedures which assure that a consumer marked as "deceased" on LexisNexis' consumer reports are, in fact, deceased.

125.    Defendant also does not employ any procedures to limit or stop the furnishing of reports to third parties for consumers which it has marked as "deceased" under any circumstances.

126.    At all times pertinent hereto, LexisNexis was acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of LexisNexis.

127.    At all times pertinent hereto, the conduct of LexisNexis as well as that of its agents, servants, and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of the Plaintiff.

128.     At all times relevant to this Complaint, Defendant's conduct was willful and carried out in reckless disregard for consumers' rights under the FCRA. By example only and without limitation, Defendant's failure to implement any procedure to identify and correct common errors prior to furnishing reports was willful because it ran a risk of harm that was known or so obvious it should have been known.

129.     Defendant's conduct was likewise willful because it indiscriminately noted Plaintiff as deceased when it knew from her disputes, her request for her consumer report, and its own consumer reports about Plaintiff, that she is alive.

130.     Defendant's procedures imposed on the Plaintiff and similarly situated consumers an unjustifiably and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

## COUNT ONE: VIOLATION OF FAIR CREDIT REPORTING ACT
## 15 U.S.C. § 1681e(b), Class Claim

131.     Plaintiff repeats the allegations in the foregoing paragraphs as though fully set forth herein.

132.     **The Inaccuracy Class**. Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this action individually and on behalf of a class of which she is a member and initially defined as:

> All natural persons who (a) had a LexID assigned, (b.) were the subject of search results furnished by Defendant to a third party within the five years before the filing of this action; (c) where those search results identified the person as deceased; (d) where Defendant did not provide a file disclosure or other correspondence to the person containing the deceased reporting prior to the date of the search; and (e) where the person identified in the report has a Social Security number that is not in the Social Security Administration Death Master File as of the date of class certification.

> Excluded from the class are all persons who have signed a written release of their claim, and/or are counsel in this case, or employed by the Federal Judiciary.

133. **Numerosity**. Plaintiff alleges that the Inaccuracy Class is so numerous that joinder of the claims of all class members is impractical. Defendant operates as one of the largest CRAs in the nation, and in Virginia alone it certainly has sold tens if not hundreds of thousands of consumer reports during the class period. Given the common nature of Defendant's "deceased" reporting, the class size will easily exceed hundreds or thousands of consumers. The names and addresses of the class members are identifiable through documents maintained by Defendant, and the class members may be notified of the pendency of this action by publication or mailed notice.

134. **Existence and Predominance of Common Questions of Law and Fact**. Common questions of law and fact exist as to all putative class members. These questions predominate over the questions affecting only individual members. These common legal and factual questions include, among other things: (a) whether Defendant had reasonable procedures to assure that it accurately identified individuals as deceased; (b) whether Defendant's conduct constituted a violation of the FCRA; and (c) whether the violation was negligent, reckless, knowing, or intentionally committed in conscious disregard of the rights of the Plaintiff and putative class members.

135. **Typicality**. Plaintiff's claims are typical of the claims of each putative class member and all are based on the same facts and legal theories. Plaintiff, as every putative class member, alleges a violation of the same FCRA provision, 15 U.S.C. § 1681e(b). This claim challenges the consumer reporting procedures of Defendant and does not depend on any individualized facts. For purposes of class certification, Plaintiff seeks only statutory and punitive damages. The recovery of class statutory and punitive damages is ideal and appropriate in circumstances like this one, where injuries are particularized and concrete, but difficult to quantify.

In addition, Plaintiff is entitled to the relief under the same causes of action as the other members of the class.

136. **Adequacy**. Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions. Neither Plaintiff nor her counsel have any interests that might cause them not to vigorously pursue this action. Plaintiff is aware of her responsibilities to the putative class and has accepted those responsibilities.

137. Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

a. As alleged above, the questions of law or fact common to the members of the class predominate over any questions affecting an individual member. Each of the common facts and legal questions in the case overwhelm the more modest individual issues. Given the complex and extensive litigation necessitated by Defendant's conduct, using individual prosecution to obtain the statutory and punitive damages sought by each member would prove burdensome and expensive. Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

b. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many consumers who are otherwise disempowered and unable to afford to bring their claims individually. Further, most consumers affected by Defendant's conduct described above are likely unaware of their rights under the law or of whom they could find to represent them in federal litigation. Individual litigation of the uniform issues in this case would be a waste of judicial

resources. The issues at the core of this case are class wide and should be resolved at one time. One win for one consumer would set the law for every similarly situated consumer.

138. "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); . . . . In enacting FCRA Congress adopted a variety of measures designed to insure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001).

139. "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

140. One of these measures, 15 U.S.C. § 1681e(b), "deal[s] with the procedures consumer reporting agencies must follow when collecting and transmitting information. Congress also gave individuals the right to sue reporting agencies for violations of FCRA. *Id.* § 1681e(b) sets forth the CRAs' overall duly:

> (b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

*Burke*, at *4.

141. The FCRA requires that Defendant must follow procedures which assure that the reports it sells meet the standard of "maximum possible accuracy." 15 U.S.C. § 1681e(b).

142.    LexisNexis does not request or require a death certificate or any other proof from any data source showing that the consumer is, in fact, deceased before placing a "deceased" notation on that consumer's report.

143.    In November 2021, when Plaintiff asked one of Defendant's representatives what Defendant did to make her deceased, the representative responded that the deceased indicator was in Plaintiff's "unverified public records."[21]

144.    LexisNexis employs no procedures at all which assure that a consumer with a "deceased" mark on her report is, in fact, deceased before placing the "deceased" mark on that consumer's report and selling that report.

145.    Such a policy is unreasonable for a number of reasons, not the least of which that LexisNexis nearly always possesses other information showing that the consumer is indeed alive— such as that the consumer is paying her insurance policies or that creditors are accessing the consumer's information from LexisNexis for purposes of making a present decision about granting the consumer credit.

146.    Even in instances where other data on the face of the consumer's report indicates that she is not deceased, LexisNexis employs no procedures which assure that a consumer with a "deceased" notation on her report is, in fact, deceased before placing the "deceased" mark on that consumer's report.

147.    Once a "deceased" mark is placed on a consumer's report and the consumer disputes the accuracy of the reporting, LexisNexis will not correct its reporting.

---

[21] Of course, it is now known that even that was untrue as demonstrated in discovery obtained from Defendant. Plaintiff has learned that the deceased marker was reported to Defendant by Experian and/or TransUnion and then resold by Defendant to Call Federal and maybe others.

148.     Defendant knows that living consumers are prohibited from accessing vital financial services.

149.     Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer reports they furnished regarding Plaintiff and the Inaccuracy Class.

150.     Despite Defendant knowing or at least having reason to know Plaintiff and the class members were alive, it published their consumer reports to end users indicating they were deceased.

151.     Defendant's violations of 15 U.S.C. § 1681e(b) were willful, rendering it liable pursuant to 15 U.S.C. § 1681n. In the alternative, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

152.     Plaintiff and each class member are entitled to recover statutory damages, punitive damages, costs, and attorneys' fees from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

### COUNT TWO: VIOLATION OF FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681g(a), Class Claim

153.     Plaintiff repeats the allegations in the foregoing paragraphs as though fully set forth herein.

154.     **The File Disclosure Class**. Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this action individually and on behalf of a class of which she is a member and initially defined as:

> All natural persons who (a) were the subject of search results furnished by Defendant to a third party within the five years before the filing of this action; (b) who thereafter and within two years thereof requested from Defendant a "Consumer Disclosure Report" or other online or request for the person's file; (c) and for whom Defendant did not include all of the records it had that day attached to their assigned LexID.

Excluded from the class are all persons who have signed a written release of their claim, and/or are counsel in this case, or employed by the Federal Judiciary.

155. **Numerosity. Fed. R. Civ. P 23(a)(1).** Plaintiff estimates that the class is so numerous that joinder of all members is impractical. Class members' names and addresses are identifiable through documents maintained by Defendants and the class members may be notified of the pendency of this action by published and/or mailed notice.

156. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether Defendant was required by 15 U.S.C. § 1681g(a) to provide to consumers all of the information that Defendant reported about them in response to a request for a copy of their full file; (2) whether Defendant's conduct constituted a violation of the FCRA; and (3) whether Defendant's conduct was willful.

157. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. Plaintiff is entitled to relief under the same causes of action as the other putative class members. Additionally, Plaintiff's claims are based on the same facts and legal theories as each of the class members' claims.

158. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the other putative class members. Plaintiff has retained counsel competent and experienced in such litigation and intends, with her counsel, to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the class members'

interests. Neither Plaintiff nor her counsel have any interest that might conflict with her vigorous pursuit of this action.

159. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each class member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for individual class members to effectively redress the wrongs done to them. Even if the class members could afford individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendant's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

160. As described above, Defendant failed to provide Plaintiff and the File Disclosure Class all of the information in its files that Defendant had provided when Plaintiff requested a copy of her full file and the class members requested their full files.

161. Defendants violated § 1681g(a) of the FCRA as to the Plaintiff and each of the class members by failing to provide them with all of the information that it possessed regarding deceased notations about them in their consumer files, its sources of the deceased notations, and a comprehensive list of everyone, including end-users, to whom Defendant provided a report with a deceased notation about them.

162.     Plaintiff and each putative class member suffered real and actual harm and injury. The rights at issue were determined by Congress to be important measures to ensure continued accuracy and completeness in Defendant's files and reports. In each instance, each class member was deprived of information that Congress has determined they were legally entitled to receive.

163.     For consumers lucky enough to learn that Defendant misidentified them as "deceased," Defendant provides no information about this false notation when these consumers ask for their file disclosures.

164.     Instead of revealing information it possesses, the sources, and to whom it provided such information, Defendant refuses to provide any information pertaining to its InstantID® Q&A product to consumers entitled to receive this information.

165.     This is problematic not just because it fails to meet the most basic disclosure requirement the FCRA demands, but Defendant does not let consumers know where it obtained the information it is reporting, or to whom Defendant gave it.

166.     Such secrecy and misdirection are the antithesis of the transparency Congress anticipated when it enacted § 1681g.

167.     Defendant knew that the FCRA required it to provide a fulsome disclosure, including all the information it possessed about Plaintiff and the File Disclosure Class at the time of their request, the sources of that information, and a list of the entities—like Call Federal—to whom it had provided information about Plaintiff and the class.

168.     Despite this knowledge and the easy-to-interpret and follow statutory mandates, Defendant failed to meet its statutory duties to provide valid disclosures.

169.     As a result, Plaintiff and the class members were deprived of information to which they were statutorily entitled, and were also prevented from being able to learn the sources of

information so that they could potentially correct inaccuracies Defendant was perpetuating about them, as well as being kept in the dark as to whom Defendant had provided information about them.

170. As to Plaintiff and the File Disclosure Class, Defendant regularly fails to provide fulsome file disclosures in violation of 15 U.S.C. § 1681g(a).

171. As a result of Defendant's failure to provide compliant disclosures, Plaintiff and the File Disclosure Class were subjected to the deprivation of information to which Congress has deemed them entitled upon a simple request.

172. The value of a full file disclosure is significant and easily greater than $12.50.

173. The denial of the full information required in such disclosure caused actual monetary harm in some amount at or over $12.50.

174. The failure to provide disclosures also deprives consumers of information Congress has decided should be provided whenever they request it.

175. Defendant's conduct was willful, rendering it liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

176. As a result of these FCRA violations, Defendant is liable for statutory damages for Plaintiff and each class member, punitive damages, attorneys' fees, and costs pursuant to 15 U.S.C. § 1681n.

### COUNT THREE: VIOLATION OF THE FAIR CREDIT REPORTING ACT
### U.S.C. § 1681i, Individual Claim

177. Plaintiff repeats the allegations in the foregoing paragraphs as though fully set forth herein.

178.   Plaintiff informed Defendant through her disputes, that she was not in fact deceased and that she was alive and well.

179.   It should have been evident that Plaintiff was alive and well but thereafter, Defendant willfully violated 15 U.S.C. § 1681i by failing to delete inaccurate information in Plaintiff's consumer file after receiving actual notice of such inaccuracies; by failing to conduct a lawful reinvestigation and by failing to maintain reasonable procedures with which to filter and delete the inaccurate deceased reporting in Plaintiff's consumer file.

180.   Plaintiff has been prevented from accessing banking services that she should have otherwise qualified for due to the inaccurate reporting of being deceased that the Defendant continued to include in Plaintiff's consumer reports.

181.   As a result of the Defendant's conduct, actions, and inaction, Plaintiff suffered damages to include, but not limited to, loss of credit, out-of-pocket expenses, aggravation, emotional stress, inconvenience, embarrassment, and frustration.

182.   As a result of Defendant's conduct, Plaintiff suffered actual damages to include, but not limited to: out-of-pocket expenses, aggravation, emotional stress, inconvenience, embarrassment, and frustration.

183.   As a result of Defendant's violations of 15 U.S.C. § 1681i, Plaintiff is entitled to recover her actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative her statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

184.   Defendant's conduct, action, and inaction were willful, rendering Defendant liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

185. Plaintiff is entitled to recover her costs and attorneys' fees from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff asks for judgment against Defendant; for class certification as pleaded; for statutory and punitive damages for herself and each member of the Classes described above; for actual or statutory and punitive damages for her individual claims; for equitable and injunctive relief; and for attorneys' fees and costs and such other specific or general relief the Court finds just and appropriate.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,

**KERRY JENNIFER SCROGGINS**

By */s/ Drew D. Sarrett*
Drew D. Sarrett, Esq., VSB #81658
**CONSUMER LITIGATION ASSOCIATES, P.C.**
626 E. Broad Street, Suite 300
Richmond, Virginia 23219
Phone: (804) 905-9900
Facsimile: (757) 930-3662
Email: drew@clalegal.com

Leonard A. Bennett, Esq., VSB #37523
Craig C. Marchiando, Esq., VSB #89736
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA  23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email:  lenbennett@clalegal.com
Email:  craig@clalegal.com

*Counsel for Plaintiff*