**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

KERRY JENNIFER SCROGGINS,

      Plaintiff,

v.                                                    Civil Action No. 3:22-cv-00545-MHL-SLS

LEXISNEXIS RISK SOLUTIONS FL INC.,

      Defendant.

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF**
**MOTION FOR CLASS CERTIFICATION**

The Federal Fair Credit Reporting Act, 15 U.S.C. §1681, et seq. ("FCRA"), was enacted in 1970. It was motivated by what Representative Sullivan remarked was "the trend toward ... the establishment of all sorts of computerized data banks" leaving "the individual is in great danger of having his life and character reduced to impersonal 'blips' and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause[.]" *Dalton v. Cap. Associated Indus., Inc.*, 257 F.3d 409, 414 (4th Cir. 2001) (citing 116 Cong. Rec. 36570 (1970)). Now, decades later, LexisNexis is the leader in an industry attempting to avoid the prophetic requirements of the FCRA. It should not be allowed to do so merely because it unilaterally determined that it cannot as profitably sell its "impersonal 'blips'" if it has to comply. As the CFPB recently stated on this exact issue:

> [C]ompanies using business models that rely on newer technologies and novel methods to collect and sell consumer data have emerged and evolved with the growth of the internet and advanced technology, leading to even more invasive surveillance practices. But while the technology has changed, and the market has grown, it is still fundamentally the same business and the rights created by Congress are still relevant today.

CFPB Statement, August 15, 2023, https://files.consumerfinance.gov/f/documents/cfpb-data-broker-rulemaking-faq_2023-08.pdf (Last accessed April 15, 2024).

Defendant reported Ms. Scroggins as deceased over a dozen times during two years, and when she tried to obtain information to understand from where the inaccuracy was coming and to whom it had been sold, Defendant's procedures barred it from sharing that information. Plaintiff moves to certify two classes, one under 15 U.S.C. §1681e(b) on behalf of live consumers whom LexisNexis reported as deceased in its two primary reporting products, InstantID and Accurint for Collections; the second under 15 U.S.C. §1681g(a) for systematically refusing to provide the sources of public records and inquiry histories to consumers whom Defendant's records show requested their file.

## I.   FACTUAL BACKGROUND

### A.  Defendant's Business

Defendant has operated in the consumer reporting business for decades, and now claims to "help tens of thousands of customers and hundreds of thousands of individual users be prepared to manage change and meet their growing risk management challenges."[1] Defendant markets itself to a diverse group of potential customers, including those in the financial services, collections, and recovery industries to name a few.[2] LexisNexis intends for its InstantID and Accurint reports to be used by banks, other financial institutions and credit debt collectors for credit purposes. ▇▇▇▇▇



▇▇▇▇▇▇▇▇▇▇▇ Ex. 1 Vaughn Dep. 19:10-12, 21:1-14. ▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇[3] Ex. 4 Davis Dep. 23:25-24:16. ▇▇▇▇▇▇ *Id.* 22:17-20. ▇▇▇▇▇▇▇ *Id.* 23:13-16; Ex. 5. Dozier Dep. 9:11-25, 11:16-12:6. ▇▇▇▇▇▇

▇▇▇▇▇Ex. 1, Vaughn Dep. 23:17-24. ▇▇▇▇▇ Ex. 3 Dozier Dep. 12:7-17. ▇▇▇▇▇

▇▇▇▇▇ *Id.* 13:15-22.

---

[1] https://risk.lexisnexis.com/our-technology (last accessed on April 14, 2024).

[2] https://risk.lexisnexis.com/ (last accessed on April 14, 2024).

[3] LexisNexis also publishes Master Terms and Conditions (the "Master Terms") for these agreements on the "LexisNexis Risk Solutions" website. *LexisNexis Master Terms and Conditions*, available at https://risk.lexisnexis.com/masterterms (last accessed on April 14, 2024). Even under its heading titled "Non-FCRA Use Restrictions", Defendant identifies its expected uses to include clear FCRA governed purposes. (2d Am. Compl., ECF 149 at ¶¶ 34-38). Defendant also overtly sells products it categorizes as FCRA products to various parties. For example, Defendant's contracts with state governments are available online. See e.g. Ex. 2 Florida Contract at 4, 30 and 34.; Ex. 3 Utah Contract, pp. 20-21, 23-76. Defendant fully acknowledges that much of its business includes FCRA governed reports.

## B. Defendant Uses One System and Database for FCRA and "Non-FCRA" Reports

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ Ex. 6, Metianu

Dep. 28:15-29:1. The system design is summarized at Ex. 7, LN_Scroggins004462. ███████

████████████████████████████████████████████████████████

████████████████ Ex. 8, Arantes Dep. 27:16-28:18, 29:3-7.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ Ex. 8, Arantes Dep. 13:10:14:16, 9:24-25, 15:8-21, 27:15-28:18.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Ex.8, Arantes Dep. 32:2-25. ███████████████████████████████

███████████████ *Id*. ██████████████████████████████████

████████████████████████████████████████████████████████

██████████ Ex. 8, Arantes Dep. 32:2-25. ██████████████████

████████████████████████████████████████████████████████

██████████ *Id*. 32:21-24. ██████████████████████████████ Ex. 9,

Herzberg Dep. 70:5-17.

## C. LexisNexis Simultaneously Collects Information for Dual Use

To build its extensive database, of which it frequently boasts, LexisNexis collects public records and other information from numerous sources. ████████████████ ████████████████████████████████████ Ex. 9, Herzberg Dep. 41:22-43:2. ████████████████ *Id.* 45:20-46:4. As Defendant's management employee explained, ████████████ ████████████████████████████████ *Id.* 65:15-68:19.

**D. LexisNexis Markets its Products for Use in Credit Decisions**

████████████████████████████ ████████████████████████████████ ████████████ Ex.10, LN_SCROGGINS032467-032474 ("█████████ ████████████████████████████████ ████████████████████████████████ ████ Ex. 1, Vaughn Dep. 27:15-22; Ex. 11 LN_SCROGGINS032499-032506 at LN 32506. ████████████████████████████████ ██████████ Ex. 10, LN_SCROGGINS032467-032474 at 1. LexisNexis markets InstantID as helping financial institutions assess applicants ████████████ ████████████████████████████ *Id.* at 1. ████████████████████ ██████████ ████████████████████████ ████████████████████████ ████████████████████████ ██████████████████

*Id.* at 7.

### E. InstantID and Accurint Reports

LexisNexis boasts that it furnishes Accurint and InstantID reports by



Ex. 12, Instant ID Technical White Paper, LN_SCROGGINS032808-032843 at p.4; Ex. 3, Utah

contract at p.18. Similarly,



*Id.* at p.24, 27.

### F. LexisNexis Reported that Ms. Scroggins Was Deceased

LexisNexis furnished InstantID[4] reports to Call Federal Credit Union ("Call Federal") on

numerous occasions between May 2021 and June 2022.

---

[4] Call Federal uses a product named "InstantID QA", which is a combination of an InstantID report followed by a set of identity verification questions. However, when a consumer fails the InstantID process, as did a dead Scroggins, the QA part is terminated.



Ms. Scroggins has a bank account at Call Federal. Ex. 16, Scroggins Dep. 16:7-9.  She had the account since 2014. *Id*. 17:24-18:6. Prior to the events alleged here, Ms. Scroggins had applied for and received a loan from Call Federal in April 2020. *Id*. 19:3-20:3, 21:14-17.  It was a loan to build a deck and a fence, but she was only able to build the deck. *Id*. 22:23-24. Before May 20, 2021, Ms. Scroggins would "regularly use the Call Federal application on [her] phone to check account information." *Id*. 24:11-14. On that day she was unable to access her account and so telephoned the credit union wherein she learned that "someone was reporting [her] as deceased." *Id*. 25:21-26:12.

One of the purposes for Ms. Scroggins May 2021 contact with Call Federal was to obtain a new home improvement loan to build the fence she could not complete from her now paid off "deck and fence" loan. *Id*. 48:18-25. She did not push further then "[b]ecause I was deceased and couldn't get past that point" and "I wanted to take care of the deceased first." *Id*. 49:1-9. Ms. Scroggins "couldn't get past the point to get a loan because they blocked me." *Id*. 51:4-8. She could not "actually apply for a loan" because "I couldn't get past the verification." *Id*. 66:5-19. "I wanted me not to be deceased before I applied for anything." *Id*.  74:1-15.

Ms. Scroggins was also concerned she would lose access to her money. *Id.* 27:14-28:3. She was then required to travel to a branch over an hour away in person to find out anything about her money or account, where Call Federal seemed to correct the mistake, and she regained account control and access. On November 15, 2021, the same thing happened again and Ms. Scroggins was locked out of Call Federal because LexisNexis had again reported her as dead. *Id.* 33:23-34:24. LexisNexis reported Ms. Scroggins as deceased on multiple occasions thereafter. As Defendant's lawyer correctly summarized: "In your dealings with Call Federal, you learned that LexisNexis had a number of times reported you as deceased, but that was something that you had learned to work around with Call Federal" such that "[y]ou couldn't get certain services over the phone; but once you went into the branch, you were able to get service in the branch[.]" *Id.* 39:24-40:13. To access her account, Ms. Scroggins thereafter "had to drive an hour out of [her] way." *Id.* 40:8-13.

In these events on May 20, 2021, Plaintiff learned from Call Federal that LexisNexis was the cause of the deceased error. *Id.* 32:5-20. Accordingly, she began to call and write Defendant's "Customer Care" department. Defendant's notes tell the story. Plaintiff first disputed the deceased reporting in May 2021. Ex. 17, LN_SCROGGINS000038. That didn't work and so when Ms. Scroggins was again blocked from accessing her credit union, she again contacted LexisNexis again complaining, "I am not deceased!!!! I have sent you paperwork back in May of 2021 and you still are reporting me as deceased." Ex. 18, LN_SCROGGINS000046-52. Call Federal even contacted LexisNexis to try and help her.  Ex. 19, LN_SCROGGINS000057. Nothing worked. LexisNexis' notes state:

> Consumer calling in with regards to a deceased indicator. Consumer states: -she had called since May and hasn't been resolved yet. -she sent in documents already proving her identity -this has affected her credit and will sue Lexis Nexis. -she wants someone who will resolve this today. . . . .Consumer wants a supervisor from the US to call her back. THREAT TO SUE ACKNOWLEDGED; HOWEVER,

THIS DOES NOT MEET THE CRITERIA TO BE FORWARDED TO LEGAL FOR REVIEW. NO FURTHER ACTION NEEDED FROM ESCALATIONS.

Ex. 20, LN_SCROGGINS000061.

Each time Ms. Scroggins made a dispute, LexisNexis' records above show she also requested her file disclosure. However, when Ms. Scroggins requested and received disclosures from LexisNexis, none of them included any of the information or sources of her reporting as deceased and none included any inquiries to companies like Call Federal. Ex. 16, Scroggins Dep. 58:18-60:23;    Ex.    21,    August    26,    2022    Comprehensive    Report,    Scroggins, LN_SCROGGINS030468-30509. This was despite even sending a letter by mail February 28, 2022. Ex. 22, LN_SCROGGINS000076-80.  The Complaint was filed on August 11, 2022.  (ECF 1).  LexisNexis was served on August 17, 2022. Ex. 23A, LN_SCROGGINS000684. This apparently caused a wave of internal privileged communications, all redacted in Defendant's production, but allowing an internal note on August 18, 2022:



Ex. 22, LN_SCROGGINS000080.

## G. Defendant Stipulates that It Maintains No FCRA Procedures Nor Contends It Complied with the FCRA

Ordinarily, a case like this one considers whether specific policies are sufficient to comply with the FCRA. Here, in the face of having to disclose information and produce documents it apparently did not want to share, Defendant has stipulated that it will not argue that it has any procedures to comply with the FCRA. Ex. 23, ECF 145, at p.2 and Apr. 9, 2024 Email Chain. Its entire merits argument is on FCRA-governance.  As to Plaintiff's accuracy claim, 15 U.S.C. §1681e(b), this probably makes sense as LexisNexis has intentionally elected not to follow FCRA

procedures. And maybe worse, it has created a two-tier system of FCRA versus Non-FCRA processes that operate side by side and which provide an obvious comparison between "lawful" versus "Non-lawful." For example, as to Scroggins, we know that her FCRA disclosure was clean of any deceased indicator because the FCRA procedures would have blocked it. Ex. 24, LN_SCROGGINS000061, 99 (Describing a LNCDR as the FCRA disclosure). LexisNexis follows ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████ Ex. 25A, LN_SCROGGINS000500-517 at 502. ████████████████

██████████████████████████████████████████████████████

██████ Ex. 25, LN_SCROGGINS026669. ████████████████████

██████████ Ex. 5, Dozier Dep, 38:17-39:3.

## H. Defendant Never Discloses Sources or Inquiries

Defendant did not disclose the source of the deceased indicator or any other non-court public records or information it furnished about Ms. Scroggins. It, as a policy, never does in its file disclosures. Defendant has stipulated to that fact. Ex. 23, ECF 145, at p.2 and Apr. 9, 2024 Email Chain. And it never shows inquiries—what other lenders or business received LexisNexis InstantID or "Non-FCRA" Accurint possibly containing the same inaccurate information? It so stipulated to that as well. Ex. 23, ECF 145, at p.2 and Apr. 9, 2024 E-mail Chain. ████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████ Ex. 26, LN_SCROGGINS032352-32412, at 19. In contrast to its FCRA

disclosures, the head of the Consumer Care center notes, ▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 27, Corn Dep. 68:21-25.

## II. ARGUMENT

### A. Plaintiff's Claims Satisfy Each Of The Elements Of Rule 23(a)

Plaintiff seeks to certify two Classes:[5]

**The Inaccuracy Class:**

All natural persons who (a) had a LexID assigned and for whom LexisNexis shows a date of birth less than 80 years ago, (b.) were the subject of an Instant ID or Non-FCRA Accurint search results (a "report") furnished by Defendant to a third party within the two years before the filing of the First Amended Complaint in this action; (c) where that report identified the person as deceased; (e) where the person identified in the report is alive.

**The File Disclosure Class:**

All natural persons who (a) had a LexID assigned and for whom LexisNexis shows a date of birth less than 80 years ago, (b) were the subject of any search results LexisNexis categorized as Non-FCRA furnished by Defendant to a third party within the five years before the filing of this action; (b) who LexisNexis' records show as having requested an Accurint or other Non-FCRA file disclosure after the first date of such search results, but no earlier than two years before the filing of the First Amended Complaint in this action; (c) and for whom Defendant did not include all of the sources of non-judicial information to which their LexID was appended and/or all inquiries records it had that day attached to their LexID dated within one year of the request.[6]

---

[5] Excluded from both classes are all persons who have signed a written release of their claim, and/or are counsel in this case, or employed by the Federal Judiciary.

[6] Plaintiff suggests the Court certify these definitions, which refine and narrow those pled in order to comport with documents and testimony Defendant itself has disclosed after the date of Second Amended Complaint. As the Court understands, the class definition is not confined to the proposal within the Second Amended Complaint. *Henderson v. Corelogic Nat'l Background Data, LLC*, No. 3:12-cv-97, 2016 WL 4611571, at *4 (E.D. Va. Sept. 2, 2016) (citing with approval cases so holding in the context of a motion to strike proposed subclasses). "Courts in every circuit have held, when a class definition is not acceptable, judicial discretion can be utilized to save the lawsuit from dismissal. Indeed, several circuits have held that a court should alter the class definition in lieu of rejecting class certification, if possible." § 7:27. Defining the class—Judicial discretion to ensure satisfactory class definition, 3 Newberg and Rubenstein on Class Actions § 7:27 (6th ed.); *see also Lowell v. Lyft, Inc.*, No. 17 CIV. 6251 (PMH) (AEK), 2022 WL 19406561, at *20 (S.D.N.Y. Dec. 22, 2022), *report & recommendation adopted as modified*, No. 17-cv-06251 (PMH), 2023 WL 2622925 (S.D.N.Y. Mar. 24, 2023); *Barenbaum v. Hayt, Hayt & Landau, LLC*, C.A. No. 18-4120, 2019 WL 4305761, at *9 n.3 (E.D. Pa. Sept. 10, 2019); *Maez v. Springs Auto.*

**1. Both Classes are sufficiently numerous.**

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The numerosity hurdle is not a high one, as joinder of a class population of 18 or more is presumptively impracticable. *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967) (finding that 18 class members was sufficient to fulfill the numerosity requirement); *see also Clark v. Trans Union, LLC*, No. 3:15CV391, 2017 WL 814252, at *7 (E.D. Va. Mar. 1, 2017) ("[J]oinder usually becomes impracticable where the class exceeds 40 members[.]) (citation omitted).

"[I]t is well settled that a plaintiff need not allege the exact number or specific identity of proposed class members." Newberg on Class Actions § 3:13 (5th ed.) In fact, "certification denials on this basis are rare and courts are generally forgiving where plaintiffs are unable to do more than set forth commonsense assumptions." *Id*; *see also Scott v. Clarke*, 61 F. Supp. 3d 569, 584 (W.D. Va. 2014) ("Where the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied" (quoting Newberg on Class Actions) (cleaned up); *Violette v. P.A. Days, Inc.*, 214 F.R.D. 207, 213 (S.D. Ohio 2003) (stating that "it is permissible for a plaintiff to make reasonable inferences drawn from available facts" and that "an information monopoly [by the party opposing the class] will not stand in the way of persons seeking relief") (cleaned up).

In the Parties' discovery compromise, thousands of consumers were identified who had contacted LexisNexis in the class period to dispute their reporting as deceased in Defendant's

---

*Grp., LLC*, 268 F.R.D. 391, 394–95 (D. Colo. 2010) (observing that a court "is not bound by the class definition proposed in the complaint, . . . and, thus, may refine the suggested definition if necessary") (quotation omitted).

"Non-FCRA" products.[7] Further, 85 were identified by name and address. The Court can properly conclude that these are just a small fraction of the many other class members who suffered an inaccurate report, but did not learn from whom or how to make such a dispute.

Like the Plaintiff herself, Defendant's records show that numerous consumers requested their file disclosure, yet were never provided—because Defendant's policy s never to provide— the sources of reported public records (such as deceased records) or identification of companies to whom LexisNexis had sold its "Non-FCRA" reports. Defendant stipulated that these consumers number greater than 500. Ex. 23, ECF 145; Apr. 9, 2024 Email Chain.

## 2. LexisNexis' and Accessible Third-Party Records Allow for Mechanical Identification of an Ascertainable Class.

Although not specifically mentioned in Rule 23, courts have held that a class must be ascertainable. *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014).[8] The purpose of the implied ascertainability requirement "is not to 'identify every class member at the time of certification,' but to define a class in such a way as to ensure that there will be some 'administratively feasible [way] for the court to determine whether a particular individual is a member' at some point." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 676 (2019) (quoting *EQT*, 764 F.3d at 358).

Easy things first, there is no dispute that the Disclosure Class is identifiable and ascertainable. Defendant maintains a database in its "Consumer Center" and has a specific process by which the contacting consumer has requested his or her file. Ex. 26 LN32352-32412.

---

[7] By compromise and decision of the Magistrate Judge, Defendant has produced the full files on 85 of these disputes and a more general list (withholding names) for over 4,000 more. ECF 122, 127, 144–45; Ex. 27, LN_SCROGGINS00008709.

[8] Most of the "Identifiability" issues addressed here would be better characterized as a manageability question considered under Superiority. *Mullins v. Direct Digital, LLC*, No. 15-1776, 2015 WL 4546159, at *3 (7th Cir. July 28, 2015). However, Plaintiff here follows the sequence and structure used in *EQT*.

Defendant's screen prints as to Ms. Scroggins are an appropriate exemplar ██████████

█████████████████████████ Exs. 17–18, LN38, 46-52. Defendant has not disputed this

element as to the Disclosure Class.

     The Accuracy Class is also mechanically identifiable.  Plaintiff is seeking to certify a class

of live consumers LexisNexis reported as deceased. There are two distinct steps for identification:

(1.) Identify consumers that LexisNexis reported as deceased during the class period within its

"Non-FCRA" Accurint or InstantID reports; (2.) Eliminate those identified consumers who are not

presently alive.

     Defendant's employee witnesses have confirmed that consumers ██████████



Ex.8, Arantes Dep. 24:22-25:3, 26:3-16, 58:10-59:6. Further, Defendant █████████

█████████████████████████████████████ *Id*. 41:4-8; 47:4-14;

57:24-58:4, 60:20-23; 71:10-21, 74:5-8.

██████████████████████████

███████████████████ *Id*. 74:21-25. However, Defendant continues to claim that it does

not maintain a log of the Accurint report it separately sold sufficient to determine if it included a

deceased indicator. This adds a second step. While Defendant may not have an exact copy of the

Accurint it furnished, it does have data sufficient to determine: *would the business rules for*

*generation of the Accurint report sold on the date in question have required the inclusion of a*

*deceased indicator? If so, was there a deceased indicator linked to the subject consumer's LexID*

*on the date of such report?* ███████████████████████

███████████████████████████████████████



Ex. 5, Dozier Dep. Tr. 49:17-51:20, 52:10-23. 53:3-16, 54:7-55:7, 56:5-18. He agreed, ██████████████████████ ██████████████ *Id*. 54:13-55:7, 56:5-18. ██████████████████████ ██████████████████[9]

Thus, the only other element to identify is whether the subject consumer is still alive.[10] Plaintiff proposes to use three ways to confirm life. First, LexisNexis itself includes a mix of both reliable and unreliable death data, with the later consisting of SSA and State government death records. Both include social security numbers and/or other known identifier. They include date of death. These governmental records are the "gold standard." Defendant's own expert testified would have opined that SSA records are reliable to determine if someone is deceased. And even the SSA regards state death records as accurate. Ex. 30 Social Security and the Death Master File, June 2019, LN_SCROGGINS30429–48 at 30439. ("State death reports are valuable to SSA because (a) they contain fewer errors than those received from other sources.") The available SSA Death Master File contains roughly 75% of all death records. The missing 25% are the records of certain states that provide records to the SSA, but do not permit their sale to private businesses. *Id*. But Defendant maintains death records it purchases from 17 states, constituting close to half of the U.S. population. Ex. 31 LN_SCROGGINS004634; Ex. 32, Census.gov Data (July 1, 2023).

---

[9] It is simple enough to know whether a deceased indicator was reporting as to the subject consumer on a given date because the records ██████████████████████ Ex. 29 C. Fouts Dep. Tr. 41:10-25.

[10] The proposed class definition is under-inclusive in several ways including the date of birth (under age 90 in order to avoid the burden of the SSA's missing "Age 100+" problem and the use of "still alive as of today" rather than on the date of the actual report, excluding those consumers who suffered a FCRA violation during the class period, but then in fact subsequently died. There is no detriment or feasibility concern with not defining the class reach to its fullest possible extent.

The remaining state records are available via third party discovery either through the remaining states, or through the unified organization that maintains and oversees the delivery of such records, the National Association for Public Health Statistics and Information Systems (NAPHIS), based in Suburban Maryland. https://www.naphis.org/.[11] In fact, NAPHIS' unified system was developed and is used in part to avoid the very issues posed by LexisNexis's shoddy and antiquated database system of identity verification. The organization explains: "[t]he EVVE Fact of Death (FOD) system, a key component of EVVE, taps into comprehensive death record databases maintained by vital records offices across the nation. This ensures up-to-date and thorough verification of deaths, providing crucial insights into when and where they occurred, benefiting both government and private organizations."[12] Beyond the use of third-party discovery to eliminate actually deceased consumers from the already narrowed subset, the final backstop includes actually contacting the subject consumer, which is a more than adequate means to confirm that someone is alive.

A digital search process, perhaps with an additional manual review, is a process particularly well-suited to a database business like Defendant's, the very purpose of which is to gather, distill, and report information. *Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 197 (E.D. Va. 2015). In language entirely applicable sub judice, Judge Payne rejected the same challenges we can expect from LexisNexis:

---

[11] "Naphis is comprised of vital records professionals representing 57 jurisdictions across the United States and its territories."  https://www.naphis.org/about/who-we-are. "Naphis is the hub for vital records data—such as birth, death, and marriage information—in the United States." https://www.naphis.org/about/what-we-do (last visited April 8, 2024).
[12] https://assets-global.website-files.com/64c80e6a0ba66b392f885150/65faf3bb2d4eb30e362d2df9_FINAL%203-YEAR%20STRATEGIC%20PLAN.pdf.

> The number of "steps" in the process and the time and effort required have no bearing on whether the individuals are or are not objectively ascertainable. See *Dunnigan v. Metro. Life Ins. Co*., 214 F.R.D. 125, 136 (S.D.N.Y.2003) ("[T]he class can be identified through an examination of the individual files of each of the participants. The fact that this manual process may be slow and burdensome cannot defeat the ascertainability requirement."). Moreover, the majority of sifting in this case will be achieved through dataset searches and other forms of electronic data analysis. …[T]his recourse to manual, member-by-member review [does not] render the inquiry "subjective." Here, most of the determinations are readily discernible and almost always binary: an individual was either listed as subject to a judgment or was not; this judgment was either recorded by Equifax or was not; Equifax either received a communication from the individual or did not; and so on.

*Id*. Even simpler here, a consumer is either alive or he is not. While identification is often difficult and only a theoretical burden at this posture, "the class does not have to be so ascertainable that every potential member can be identified at the commencement of the action. . . . If the general outlines of the membership of the class are determinable at the outset of the litigation, a class will be deemed to exist." 7A FED. PRAC. & PROC. CIV. § 1760 (3d ed.).

### 3. There are common questions linking Class Members.

Rule 23(a)(2) requires that the court find that that there are questions of law or fact common to the class, but complete congruence of those questions is not necessary. *Lienhart v. Dryvit Sys. Inc.,* 255 F.3d 138, 146 (4th Cir. 2001). There need be only a single issue common to the class. *Clark v. Trans Union, LLC*, No. 3:15CV391, 2017 WL 814252, at *9 (E.D. Va. Mar. 1, 2017) (citations omitted). "[T]he plaintiff must "demonstrate that the class members 'have suffered the same injury,'" and that the claim "depend[s] upon a common contention" that "is capable of classwide resolution-which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Gray v. Hearst Commc'ns., Inc.*, 444 F. App'x 698, 700–01 (4th Cir. 2011) (citations omitted).

This Court has ample experience with commonality in the FCRA context as "FCRA cases, and specifically those involving violations of § 1681g(a)(2), have repeatedly been held to satisfy

16

the commonality requirement of Rule 23(a)(2)." *Clark v. Trans Union, LLC*, No. 3:15CV391, 2017 WL 814252, at *9 (E.D. Va. Mar. 1, 2017). In 2014, in a case in which the applicability of the FCRA was in dispute, this Court found, "[a]s to the Rule 23(b)(3) class, the class members have suffered the same injury, based on Defendants' treatment and sale of class members' information without treatment required by the FCRA; their claims depend on a common contention—namely, that Defendants' treatment and sale of information is subject to the FCRA." *Berry v. LexisNexis Risk & Info. Analytics Grp., Inc.*, 3:11-CV-754, 2014 WL 4403524, at *10 (E.D. Va. Sept. 5, 2014). Not long after, the Court certified an FCRA class action against Equifax in which the plaintiff pressed a similar Section 1681e(b) inaccuracy claim. *See Souter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 191 (E.D. Va. 2015). There, the Court defined the core commonality issues as "the inaccuracy of the consumer reports, the reasonableness of the procedures alleged to cause these inaccuracies, whether Equifax's conduct was willful, and the determination of statutory damages." *Id.* at 201.

### a. Whether the FCRA Governs Defendant's Reports is a Common Question

The dispositive, and most predominate issue in this case is a classwide common one: *Whether Defendant is a consumer reporting agency selling consumer reports*. If Defendant is FCRA-governed, the case is largely disposed. Defendant has staked its entire defense on that question, having stipulated both that it does not have any procedures to comply with the statute (and will not argue otherwise), and as to a *Safeco* willfulness safe-harbor.

### b. The Question of Whether *Berry* is a Safe-Harbor is a Common One.

The *Berry* case alleged that the LN Accurint product sold as of 2013 was FCRA-governed. The consumer-plaintiffs (and the undersigned) sought to force LN to apply the FCRA's dispute investigation and disclosure protections to a specific type of Accurint. For a range of reasons—the uncertainties of litigating such a case before Judge Spencer, the lack of deep evidence about the

products, an earlier reaction from a District Judge in the *Adams* case before Eastern District of Pennsylvania, and the efforts of Magistrate Judge Lauck and a private mediator—the *Berry* case settled. By its terms, the contract there ended in 2020. Plaintiff has moved to exclude further "*Berry*" contentions in her contemporaneously filed Motion in Limine. But regardless, at the present posture, whether or not *Berry* somehow offers a defense is clearly a common question applicable equally to all class member claims.

### c. Whether the Information in Defendant's Reports was "Collected in whole or in part" for use in a Consumer Report is a Common Question.

Defendant's argument against FCRA governance is that furnished information that may otherwise be consumer report information is not so classified if the specific user of a specific report does not use it for a FCRA purpose. LexisNexis asserts that whether a report is a "consumer report" is determined on a report-by-report basis.  But this is plainly not the law.[13] Use of a report for a FCRA purpose may cause that report to be FCRA-governed, but the lack of such permitted use does not do the opposite. Put another way, the specific use by one consumer can hurt LexisNexis' position, but cannot help it. The question of whether the reports an agency sells are consumer reports is not individualized or idiosyncratic, and it is common to class members.

The relevant FCRA provision is 15 U.S.C. §§1681a(d).  Defendant acknowledges that it is a consumer reporting agency that sells consumer reports, even as it disputes that all of its reports

---

[13] Defendant has tried to dodge or delay the Court's deciding of the FCRA governance question, refusing Plaintiff's express invitation to present that issue early whether under Rules 12 or 56. It makes sense for the Court to answer this legal question—whether FCRA-governance is determined on an individualized (report-by-report) basis versus on a common one.  It is germane for commonality and, as well, apparently, the case will not resolve until this defense, however weak, is foreclosed.

are so designated.[14] The argument in this regard is not likely to be on whether Defendant is a CRA, but rather whether its reports challenged in the case are consumer reports sold by that CRA.

The products on which Plaintiff moves for class certification are two that Defendant claims are not FCRA-governed, its "non-FCRA" Accurint sales and its "Instant ID" reports. The definition of consumer report is at 15 U.S.C. §1681a(d), which defines "consumer report" to mean:

> any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for—
> (A) credit or insurance to be used primarily for personal, family, or household purposes;
> (B) employment purposes; or
> (C) any other purpose authorized under section 1681b of this title.

Simplified, "a consumer report is made up of three fundamental elements. First, a "consumer reporting agency" must "communicat[e] ... information[.]" Second, the "communication of information" must "bear[ ] on" any one of a list of factors. Third, the "information" communicated must be "used or expected to be used or collected in whole or in part" for any one of several purposes." *Yang v. Gov't Emps. Ins. Co.*, 146 F.3d 1320, 1323 (11th Cir. 1998) (referring to this third element as the 'Purpose Clause.').[15] As straightforward as this definition may be, Defendant suggests an alternate statement of the third element, contending that the Court will look only to the specific use made of the specific report by the specific user. But that is not the law. "Under the plain language of the FCRA, a 'communication of information' is a 'consumer report' if *any one*

---

[14] A "consumer reporting agency" is an entity that participates in whole or in part in assembling and furnishing "consumer reports." 15 U.S.C. §1681a(f). National Consumer Law Center, FAIR CREDIT REPORTING (10th ed. 2022), §2.5.5, updated at www.nclc.org/library. ("First, one must ascertain whether the information furnished qualifies as a "consumer report." The definition of "consumer report" in turn incorporates the definition of "consumer reporting agency," so there is some circularity to the analysis.").

[15] *Yang* is the seminal case nationally outlining the structure of this definition.

*of the three components* in the Purpose clause is met." *Id*. at 1321 (emphasis in original).

The part of the statutory definition LexisNexis ignores—and asks the Court to ignore—is "collected in whole or in part." Where the furnishing entity collects information that it expects will be used in whole or in part for a FCRA-purpose, the reports it sells using that information are consumer reports regardless of idiosyncratic use. *Hansen v. Morgan*, 582 F.2d 1214, 1218 (9th Cir. 1978) (purpose for which a report is used is immaterial where the seller "collected the information in the report for use consistent with the purposes stated in the act."). As a sister court outlined:

> As here, the defendant in *Yang* argued the information it received from a CRA was not a "consumer report" because the purpose for which the defendant received it (investigation of an insurance claim) was not a purpose listed in Section 1681a(d)(1). The *Yang* panel noted that communicated information is a "consumer report" if it is "used *or* expected to be used *or* collected" for a specified purpose. 146 F.3d at 1324 (emphasis added). Because the disjunctive "or" joins the quoted verbs, "[u]nder the plain language of the FCRA, a 'communication of information' is a 'consumer report' if *any one of the three components* in the Purpose clause is met." *Id.* at 1324-25 (emphasis in original).

*Sullivan v. Wells Fargo Bank, N.A.*, 418 F. Supp. 3d 939, 946 (S.D. Ala. 2019). Defendant's "report-by-report" contention, "flies in the face of the disjunctive phrase, 'used or expected to be used or collected,' effectively redacting that phrase to read simply, 'used.' " *Id*; *see also Ippolito v. WNS, Inc*., 864 F.2d 440, 453 (7th Cir.1988) ("even if a report is used or expected to be used for a non-consumer purpose, it may still fall within the definition of a consumer report if it contains information that was originally collected by a consumer reporting agency with the expectation that it would be used for a consumer purpose"); *St. Paul Guardian Ins. Co. v. Johnson*, 884 F.2d 881, 884 (5th Cir. 1989) (explaining that a report was a 'consumer report' when "the information in the report ... was collected in whole or in part by a credit reporting agency for FCRA enumerated purposes."); *Bakker v. McKinnon*, 152 F.3d 1007, 1012 (8th Cir. 1998) ("Under the FCRA whether

a credit report is a consumer report does not depend solely upon the ultimate use to which the information contained therein is put, but instead, it is governed by the purpose for which the information was originally collected in whole or in part by the consumer reporting agency.")

What's surprising given the plain statutory text is that Defendant even resists this obvious conclusion. The leading case on this is *St. Paul Guardian Ins. Co. v. Johnson*, 884 F.2d 881 (5th Cir. 1989).[16] The Fifth Circuit provided a helpful explanation as to the senselessness of Defendant's position:

> To illustrate the untenable nature of St Paul's construction of the FCRA in this context, suppose X secured Y's credit report for the sole purpose of disclosing it to embarrass Y. Under St Paul's reasoning, focusing solely on X's "use" of the report, the report would not be a credit report under the FCRA and thus Y would not be afforded FCRA protections. Not only would this result run contrary to congressional intent, it would render meaningless FCRA section 1681b which allows for the release of credit reports only for certain purposes. Under St Paul's reasoning, credit reports would be releasable under all circumstances. If used for non-FCRA purposes, a credit report would be releasable because it did not fall with the FCRA definition of a consumer report. If used for FCRA purposes, a credit report would likewise be releasable because it would meet the definition of a consumer report. We simply cannot conclude that Congress intended such an illogical result. Accordingly, we reject St Paul's argument that the definition of a "consumer report" under the FCRA depends on the use to which the information contained therein is put and conclude that the purpose for which the information was collected governs whether that report is a "consumer report" under the FCRA.

*Id.* at 884-85.

> **d. The Information in Defendant's Reports was Collected and Maintained in its Integrated Operation that is used for both its FCRA and its Non-FCRA reports.**

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[16] That's 3 Circuits that have expressly ruled. Further, *St Paul* has been cited by the Fourth Circuit's own seminal FCRA decision, *Dalton v. Cap. Associated Indus., Inc.*, 257 F.3d 409, 414 (4th Cir. 2001), on a more general FCRA principle.

██████████████████████████████████████████████████

██████████ than Plaintiff and her counsel understood just months ago.

████████████████████████████████████████████████

██████████████████████ Initially in this case, Plaintiff believed that LexisNexis would defend this issue by arguing that it had structured its operation to assign "FCRA sales" to one corporate entity, LexisNexis Risk Management, Inc., and "Non-FCRA" sales to the Defendant. It turns out that Defendant itself also sells reports it acknowledges are FCRA consumer reports. It openly sells a version of Accurint that it represents is FCRA governed. Its contract sells FCRA products including even reselling traditional Big-3 credit reports, criminal background and employment checks, etc. ████████████████████████

██████████████████████ And Defendant advertises and expects that its "Non-FCRA" reports will be used to determine whether a consumer is eligible for credit—clearly a FCRA purpose.

All of these facts are solely regarding the current named Defendant, but the law and facts would go even further. As detailed above, ████████████████████████

██████████ —at least a significant percent of the time— ████████████████████

Defendant can disagree. Of course it will (about nearly everything). But that's not the point now. The point presently is whether those questions—all of which pertain to the Defendant and none to any individual consumer—are common ones. Yes. They are.

**e. Liability is a Common Question**.

Defendant has stipulated that it does not follow any procedures that comply with the FCRA—specifically ¶¶1681e(b) and 1681g(a). If the FCRA applies, liability is established. Still, the ease of that path does not change that basic liability remains a common issue. *See Infra* Predominance. All class members were falsely reported a deceased because Defendant chose not to follow reasonable procedures required at §1681e(b). *Soutter,* 307 F.R.D. at 205 (finding

consumer reporting agencies' procedures to "raise a common contention of reasonableness that can be resolved with common answers on a classwide basis"); *Feliciano v. CoreLogic Rental Property Solutions, LLC*, 332 F.R.D. 98, 106 (S.D.N.Y. 2019) (finding "whether defendant followed reasonable procedures to ensure the accuracy of its records" to be a common question).

### f.  Willfulness is a Common Question

Whether Defendant's violations of the FCRA were "willful" remains a common question answered only with common evidence. *Ealy v. Pinkerton Gov't Servs., Inc.*, 514 F. App'x 299, 305 (4th Cir. 2013) (discussing as "the qualitatively overarching issue" the "liability issue of the defendant's [FCRA] willfulness"); *Henderson v. Trans Union LLC*, No. 3:14-CV-00679-JAG, 2016 WL 2344786, at *3 (E.D. Va. May 3, 2016) ("The common questions in this case include whether Trans Union's process for sending PEER Letters violates § 1681k and whether Trans Union's violation, if any, was willful."); *Manuel v. Wells Fargo Bank, Nat. Ass'n*, No. 3:14CV238, 2015 WL 4994549, at *10 (E.D. Va. Aug. 19, 2015) ("[T]his Court has held that "[t]he question of willfulness is also a common question . . . [when] [t]here is no contention that [Defendant's] state of mind as to individual consumers varied in any way.").

### 3.  Plaintiffs' claims are typical of those of Class Members.

A class representative's claims or defenses must be "typical" of the claims or defenses of the class. FED. R. CIV. P. 23(a)(3). The Fourth Circuit has described the typicality requirement as "the heart of a representative [party's] ability to represent a class." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006). Typicality demands "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.*; *accord Soutter v. Equifax Info. Servs., LLC*, 498 F. App'x 260, 264 (4th Cir. 2012); *Lienhart*, 255 F.3d at 146. The Plaintiff's interest in prosecuting her case must advance the interests of the Class. *Soutter*, 498 F. App'x at 264. Moreover, class representatives must not have an interest that is antagonistic to

that of the class members. *Rodger v. Elec. Data Sys. Corp.*, 160 F.R.D. 532, 538 (E.D.N.C. 1995). The essence of typicality is that: "as goes the claim of the named plaintiff, so go the claims of the class." *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998); *accord Deiter*, 436 F.3d at 466; *Soutter*, 498 F. App'x at 264. Nonetheless, typicality does not require that a class representative's claims be perfectly identical to the class members' claims. *See, e.g.*, *Broussard*, 155 F.3d at 337; *Deiter*, 436 F.3d at 467; *Soutter*, 498 F. App'x at 265; *In re Mills Corp. Sec. Litig.*, 257 F.R.D. 101, 105 (E.D. Va. 2009). Rather, "the interests of the party representing a class must be substantially similar to those of the unrepresented parties." *In re Mills*, 257 F.R.D. 101, 105 (E.D. Va. 2009); *see also In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 538 (E.D. Va. 2006). However, "the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification." *In re BearingPoint*, 232 F.R.D. at 538.

> As the Fourth Circuit set out the typicality analysis in *Soutter*:
>
> To determine if [Plaintiffs] ha[ve] shown typicality, we compare [their] claims and [NBD]'s defenses to [their] claims with those of purported class members by reviewing the elements of [Plaintiffs'] prima facie case and the fact supporting those elements and examining "the extent" to which those facts "would also prove the claims of the absent class members."

*Soutter v. Equifax Info. Servs., LLC*, 498 F. App'x 260, 265 (4th Cir. 2012) (citing *Deiter*, 436 F.3d at 467). Applying the Fourth Circuit's roadmap, Plaintiff's claim and facts are clearly typical of the putative Class's claims and facts. As the Fourth Circuit held, "Soutter's claim under § 1681e(b) requires her to prove that:

> (1) her credit report was inaccurate;
> (2) Equifax's unreasonable procedures caused the inaccuracy; and
> (3) Equifax's behavior was willful."

*Id*. (numbered structure added). This case is that simple. Each of these elements is uniform and the same across the Class.

First, there could not be a more objective case as to accuracy—the class member was alive when Defendant reported her as dead. Plaintiff's credit report was inaccurate in the identical way that the credit report of each putative Class Member was inaccurate. By nature of the Class definition, every putative Class Member is in the exact same circumstance. Second, Plaintiff must prove that Defendant was governed by the FCRA, which as discussed above is the same proof across class members, and that it did not follow "reasonable procedures to ensure maximum possible accuracy." 15 U.S.C. §1681e(b). While that question here may be easy to establish as Defendant has stipulated that it will not argue it followed or even had such procedures, this remains the same between Plaintiff and Defendant the same way it does between all class members and Defendant. Lastly, Plaintiff will need to prove that Defendant's violations were willful. As addressed regarding commonality, the facts and arguments to be offered by the Plaintiff are typical of those that will be offered on behalf of the Class.

The same of course is true as to the Disclosure Class. Here, the Plaintiff's "interests align with those of the class, and she alleges to have suffered the same injury" and her "§ 1681g(a)(2) claim arises from" LexisNexis' "failure to disclose the source of information reported on her consumer report. And the Class Claim arises from the same omission." *Clark v. Trans Union, LLC*, No. 3:15CV391, 2017 WL 814252, at *11 (E.D. Va. Mar. 1, 2017)

Plaintiffs' claims are not just typical of Class Members' claims, they are *identical*. Plaintiff is a member of the proposed Classes, and her claims rise or fall on the same uniform evidence as Class Members'. Typicality requires nothing more. *Souter*, 498 F. App'x at 265.

### 4. Plaintiffs and their Counsel will adequately represent the interests of the Class.

The final component of Rule 23(a) requires that the "representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). Rule 23(a)(4) "is met if the named plaintiff has interests common with, and not antagonistic to, the [c]lass's interests; and ...

the plaintiff's attorney is qualified, experienced and generally able to conduct the litigation." *Milbourne I*, 2014 WL 5529731, at *8 (internal citations and quotations omitted). "[T]he adequacy inquiry itself focuses on conflicts of interests." *Soutter*, 307 F.R.D. at 213. Ms. Scroggins "meets the adequacy requirement" because she "and the class share the identical interest of establishing" LexisNexis' "liability based on the same questions of law and fact" she has no conflicts of interest. *Clark* at *13.

Plaintiff's Counsel are experienced in class action work as well as consumer protection issues under the Fair Credit Reporting Act, and have been approved as class counsel in numerous cases before this Court.[17] "This Court has repeatedly found that Clark's counsel is qualified to conduct such litigation. . . . This Court echoes the sentiments previously stated about Clark's counsel because they pertain here with equal vigor." *Clark* at *13 (collecting cases, citations omitted).

Further, Plaintiff has demonstrated her commitment to the Class by finding skilled counsel, providing all information and documents requested, more than merely enduring her all day deposition and refusing a path of levering class member interests for her own individual gain. Plaintiff does not have any interests antagonistic to those of the proposed Class and has cooperated with her counsel and pursued this litigation vigorously to redress the wrongs alleged. Ex. 34, Pl. Decl. at ¶¶ 17-22.

**B.  The Class Likewise Satisfies The Requirements Of Rule 23(b).**

Under Rule 23(b)(3), an action that satisfies the threshold prerequisites for certification may be maintained as a class action if the court finds that: (1) "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members";

---

[17] The concurrently filed Declaration of Leonard A. Bennett sets forth proposed Class Counsel's experience and ability to serve as Class Counsel. Ex. 33, Bennett Decl.

and (2) "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." FED. R. CIV. P. 23(b)(3). Plaintiff's claims satisfy those requirements.

### 1. Classwide issues will predominate over any individual ones.

Rule 23(b)(3) requires that the questions of law or fact common to all members of the class predominate over questions pertaining to individual members. *Lienhart*, 255 F.3d at 142; *Simmons v. Poe*, 47 F.3d 1370, 1380 (4th Cir. 1995). As the Fourth Circuit explained in reversing denial of certification in a FCRA case:

> Where, as here, the qualitatively overarching issue by far is the liability issue of the defendant's willfulness, and the purported class members were exposed to the same risk of harm every time the defendant violated the statute in the identical manner, the individual statutory damages issues are insufficient to defeat class certification under Rule 23(b)(3).

*Stillmock v. Weis Markets, Inc.*, 385 F. App'x 267, 273 (4th Cir. 2010).  *See also*. *Clark v. Trans Union, LLC*, No. 3:15CV391, 2017 WL 814252, at *15 (E.D. Va. Mar. 1, 2017) (Lauck) ("The dominant issue before the Court is the ultimate question of liability: whether TransUnion willfully failed to disclose as its source the third-party public records vendor, LexisNexis, in violation of § 1681g(a)(2). This alone, as the qualitatively overarching issue of this case, satisfies the predominance requirement and outweighs any issues particular to individual class members."); *Henderson v. Trans Union LLC*, No. 3:14-CV-00679-JAG, 2016 WL 2344786, at *5 (E.D. Va. May 3, 2016) (Gibney) ("In this case, the question of whether Trans Union's process for sending PEER Letters violates § 1681k predominates over questions affecting only individual members. Trans Union argues that this question "not only does not predominate, it is flatly irrelevant because the answer cannot drive the class-wide resolution of liability in this case. The Court disagrees. "); *Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 216 (E.D. Va. 2015) ("Rather, the *primary lesson* of *Stillmock* was that simple or formulaic statutory damages determinations do *not* outweigh more qualitatively weighty common questions, such as willfulness.)

Beyond the success on this issue in other FCRA cases, predominance in this case is even clearer as there really is a huge single issue that will decide the case in its entirety—whether Defendant's reports are FCRA-governed. No individual issue could possibly predominate above that.

Still, the defense argument *du jour* is Article III standing.  Every FCRA defendant feels compelled to argue it on class certification. As to the Accuracy Class and Ms. Scroggins claim under §1681e(b), every class member has standing because each report was materially inaccurate and furnished to a third party. The Supreme Court expressly held such. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 433, 141 S. Ct. 2190, 2209, 210 L. Ed. 2d 568 (2021) ("TransUnion points out that the reports merely identified a consumer as a "*potential* match" to an individual on the OFAC list—a fact that TransUnion says is not technically false.  … The harm from being labeled a "potential terrorist" bears a close relationship to the harm from being labeled a "terrorist." In other words, the harm from a misleading statement of this kind bears a sufficiently close relationship to the harm from a false and defamatory statement. In short, the 1,853 class members whose reports were disseminated to third parties suffered a concrete injury in fact under Article III."); *see also Fernandez v. RentGrow, Inc.*, 341 F.R.D. 174, 190 (D. Md. 2022); *Chuluunbat v. Experian Info. Sols., Inc*., 4 F.4th 562, 567, n.3 (7th Cir. 2021).

Similarly, *Ramirez* ends any argument regarding the Disclosure Class. Each class member would have suffered the same injury—denial of entire categories of information to which they had a legal right. In *Ramirez*, the consumers lack standing because their complaint was merely as to the form or format by which it was received.  *Ramirez*, 594 U.S. at 141. ("The plaintiffs separately argue that TransUnion's formatting violations created a risk of future harm. Specifically, the plaintiffs contend that consumers who received the information in this dual-mailing format were

at risk of not learning about the OFAC alert in their credit files."). But where, as here, the deprivation was in total – the information was not provided at all—in any format—the consumer still has been concretely harmed. *Clark v. Trans Union, LLC*, 2016 WL 7197391, at *9 (E.D. Va. Dec. 9, 2016) ("This Court follows several others in concluding that the FCRA permits a plaintiff like Clark to establish Article III standing when alleging a non-disclosure under § 1681g(a)(2) because that failure to reveal source information reflects the type of harm, or injury in fact, that *Spokeo* recognizes as "concrete" and "particularized."); *Tailford v. Experian Info. Sols., Inc.*, 26 F.4th 1092, 1100 (9th Cir. 2022) (But the § 1681g claim at issue in this case is distinguishable from the disclosure claims that the *TransUnion* Court found lacked standing because … [u]nlike the plaintiffs here, who alleged that certain information was *missing* from Experian's § 1681g disclosures, the plaintiffs in *TransUnion* lacked standing because their only allegation of non-disclosure was improper formatting of the information."); *Greenwood v. Trans Union, LLC*, 2021 WL 3516666, at *3, n.1 (N.D. Iowa Aug. 10, 2021).

   **2.  A class action is the superior method to resolving these claims.**

   The hallmark of superiority is efficiency, with the Court looking "to judicial integrity, convenience, and economy" in the analysis. *Talbott v. GC Servs. Ltd. P'ship*, 191 F.R.D. 99, 106 (W.D. Va. 2000). "When making a 'determination of whether the class action device is superior to other methods available to the court for a fair and efficient adjudication of the controversy . . . [the court should] not contemplate the possibility that no action at all might be superior to a class action.' *Brown v. Cameron–Brown Co.*, 92 F.R.D. 32, 49 (E.D. Va. 1981)." *Clark*, at *16. The Court should also consider the "'inability of the poor or uninformed to enforce their rights, and the improbability that large numbers of class members would possess the initiative to litigate individually.'" *Id.* (quoting *Citifinancial v. Logan Furniture Mart, Inc*., 503 F.2d 1161, 1164 (7th Cir. 1974)). This Court has found superiority to exist in cases where, like here, proposed class

members press "identical, fairly small claims for relief," and who would be unlikely to pursue them if forced to do so individually. *Williams v. LexisNexis Risk Mgmt. Inc*., CIV A 306CV241, 2007 WL 2439463, at *9 (E.D. Va. Aug. 23, 2007). Defendant here has not identified any cases beyond Berry where a consumer has figured out what it is actually doing and found counsel skilled enough to pursue such a case. If Plaintiff had not brought this case, found her experienced counsel and resisted an individual payoff, not one other consumer could expect to prosecute these claims. *Clark*, at *16 ("[A] class action could provide redress to claimants who, as a result of the technical nature of TransUnion's violation, might not otherwise know the existence of their respective claims.") But let's suspend reality and imagine that the thousands of class members did bring such claims individually. It would be less efficient, by any reckoning, to have thousands of separate lawsuits over the question of whether Defendant's reports are "consumer reports," pursuing the same discovery, deposing the same witnesses, and arguing the same motions in front of multiple judges in different districts than to resolve all of those claims right here and now, in this Court. Defendant's favored outcome completely defeats the efficiency and economy that class actions provide, particularly now that Plaintiffs have greatly streamlined the proposed Class and, as set forth above, shown that class treatment is appropriate.

This leads to an additional issue, which the Court recognized in *Thomas*—there are strong *disincentives* for plaintiffs to sue individually. *Thomas*, 312 F.R.D. at 425–26. *See also Clark v.* at *16 ("[A] class action gives claimants incentive to pursue claims that otherwise would not be worth pursing in light of the insignificant damages that could be recovered.").

### III.  CONCLUSION

The proposed class meets the requirements of Rule 23(a) as well as Rule 23(b)(3). On this basis, the Plaintiff respectfully moves that the Court grant her Motion for Class Certification.

Dated: April 15, 2024                    Respectfully submitted,

                                         **KERRY JENNIFER SCROGGINS**

                                         By_____*/s/ Drew D. Sarrett*_____
                                         Drew D. Sarrett, VSB #81658
                                         **CONSUMER LITIGATION ASSOCIATES, P.C.**
                                         626 E. Broad Street, Suite 300
                                         Richmond, Virginia 23219
                                         Phone: (804) 905-9900
                                         Facsimile: (757) 930-3662
                                         Email: drew@clalegal.com

                                         Leonard A. Bennett, VSB #37523
                                         Craig C. Marchiando, VSB #89736
                                         Adam Short, VSB #98844
                                         John J. Maravalli, VSB #99000
                                         **CONSUMER LITIGATION ASSOCIATES, P.C.**
                                         763 J. Clyde Morris Blvd., Ste. 1-A
                                         Newport News, VA  23601
                                         Telephone: (757) 930-3660
                                         Facsimile: (757) 930-3662
                                         Email: lenbennett@clalegal.com
                                         Email: craig@clalegal.com
                                         Email: adam@clalegal.com
                                         Email: john@clalegal.com

                                         *Counsel for Plaintiff*

31