# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

KERRY JENNIFER SCROGGINS,

     Plaintiff,

v.                                     Civil Action No. 3:22-cv-00545-MHL-SLS

LEXISNEXIS RISK SOLUTIONS FL INC.,

     Defendant.

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION OF CLAIMS AGAINST DEFENDANT LEXISNEXIS RISK SOLUTIONS FL INC.**

Plaintiff Kerry Jennifer Scroggins ("Plaintiff" or "Ms. Scroggins"), by Counsel, respectfully submits this reply in support of her Motion for Class Certification of Claims against Defendant LexisNexis Risk Solutions FL Inc. ("Defendant" or "LexisNexis") (ECF 204).

## I.    REPLY AS TO LEXISNEXIS' FACTS

Defendant's opposition is not really a "response" to Plaintiff's memorandum, but rather a freestanding statement of LexisNexis' affirmative contentions and facts. The opposition almost entirely ignores the specific facts presented, arguments made, and cases cited in Plaintiff's opening. Defendant's opposition here, as its defense in the case generally, is largely out of congruence with Plaintiff's case and contentions. For example, in its opposition (as with its proposed expert testimony), Defendant relies heavily on the position that identity verification is separate from eligibility and that the use of a specific report—say for eligibility—is determinative of FCRA-governance.  It repeatedly argues that the Court should not enforce the FCRA against these products at LexisNexis because doing so would have a harmful effect on the banking industry. It ignores, entirely, Plaintiff's arguments that FCRA-governance is not a case-by-case, report-by-report question and that whether or not LexisNexis' banking customers would be harmed by FCRA enforcement is irrelevant to whether the FCRA applies.

Defendant's proffered facts largely concede the Rule 23 elements as nearly every dispute LexisNexis makes (or indirectly makes) is common to all class members. For example, LexisNexis claims that its identity verification and fraud prevention products are for a different purpose than conventional eligibility products and that it sells those unconventional eligibility products to many customers other than financial institutions. (ECF 255 at 4-5.)[1] But this would be true for all class members and Defendant's argument that this would support its claim not to be FCRA-governed is

---

[1] Plaintiff cites herein to the ECF page numbers in the header of Defendant's document, rather than in internal page numbers included in the bottom of the document.

obviously a common issue. The same is true for Defendant's repeated arguments about *Berry*. (*Id.* at 11.) Plaintiff's opening facts and argument overcome all of Defendant's challenges, but regardless these are common questions that support the argument that a classwide resolution is superior.

The same is true as to Defendant's footnoted attempt to answer the facts explaining Defendant's integrated business model, selling both acknowledged FCRA reports and others. Plaintiff did not simply assert, but cited unvarnished deposition testimony establishing that banks are Defendant's largest customers (ECF 230 at 2.) FCRA and non-FCRA customers are managed by the same employees with the same customer support. *Id.* FCRA products are a substantial part of Defendant's business. *Id.* Defendant's Master Agreement explicitly lists FCRA uses and even FCRA products amongst its offerings. *Id.* at n.3. Its operation—whether FCRA or "not FCRA" is integrated and the database used, the processes and the management are the same regardless. *Id.* at 3. None of these facts are contested in Defendant's opposition. But even if they were, that contest simply emphasizes the importance of this FCRA-governance question and the facts regarding same as common across the Classes.

Defendant denies that its contracts state that Defendant contracts to provide consumer reports. (ECF 255 at 10-11, n.9.) But the Court can read the cited and attached exhibits. This Defendant itself contracts to sell FCRA products and to sell products that are clearly for eligibility purposes. Even if the world were as Defendant misstates—that these products are provided by other entities (such as its affiliated entity or Equifax and Trans Union), Defendant never answers the fact that it is still a "Reseller" CRA governed by the statute. *See* 15 U.S.C. § 1681a(u). But, as before, these issues demonstrate predominance, commonality and typicality.

Defendant attempts to rewrite the factual history as to Ms. Scroggins. (ECF 255 at 8-10.) While its text is almost solely postured argument, Defendant ignores the entirety of the relevant facts established and supported in Plaintiff's opening. (ECF 230 at 5-8.) Plaintiff need not repeat the unaddressed evidence and explanations.

Defendant continues its eleventh-hour attack on the SSA Death Master File (DMF). It raised the same complaints that it began on March 8, 2024 and used its "expert" Northeim to repeat. (ECF 255 at 12). One complaint Defendant newly raised is the SSA DMF's omission of data for individuals over the age of 100. (*Id*.; ECF 230 at 14, n.10). Plaintiff proposed that the Court certify a class limited to consumers less than age 80. The remaining records LexisNexis and its expert note are those from state sources that while providing their death records to the SSA, have not authorized it to sell them to commercial entities such as Defendant. *Id*. But Defendant does not deny that the SSA DMF and the state records are effective as sources for identifying deceased consumers. In fact, LexisNexis itself already possesses the state records for roughly half of the U.S. population. (ECF 230 at 14). Regardless, the problem is that Defendant has not been able to access recent records in the SSA submitted by certain states that do not allow the SSA's distribution of same to a commercial operation such as LexisNexis. The fact that LexisNexis cannot cheaply access those SSA and state records is not dispositive as to whether they can be obtained for class identification. Plaintiff addresses this further below.

Defendant attempts to differentiate its products based on the syntax of the results: "The person you searched for is deceased." (ECF 255 at 13-14.) However, there are no material differences in the technical output language sent to Defendant's customers: "The person you searched for is deceased" is inaccurate in the same way that "the person you searched for using the PII submitted is deceased." Defendant's customer search for a specific person using personally

identifying information ("PII"). All cited materials and deposition testimonies confirm this. Defendant's searches do not focus on individual PII variables but rather on identifying a specific consumer.[2]

Defendant's last fact paragraph is misleading. (ECF 255 at 15). Plaintiff has already established that we can identify each consumer who was subject to the challenged reports even if—as Defendant claims—an exact copy of the full report sold is not archived.

## II.    ASCERTAINABILITY

The Court should step back at this point and consider these LexisNexis defenses. Much of the opposition brief argues that there are no records available to determine if a consumer is in fact alive or dead.   So, for the higher accuracy standard FCRA reports, Defendant only reports a consumer as deceased if it has SSA or State records to confirm the death.  If it does not know a consumer is deceased from a recognized source, it does not report that.  But for its "non-FCRA" reporting, there is no limit.  It sells reports with deceased indicators from the non-Governmental sources – webscrapes, obituaries, TransUnion bulk data, e.g. - and ends up reporting thousands of live consumers as deceased.  Defendant admits that it did this. It has only two responses:  a. The FCRA does not apply so there is no law against selling such inaccuracies; and b. Even if Defendant did that, a class cannot be certified because our data is so poor that you cannot identify a class.

This is really the only substantive argument Defendant makes.  There is not presently a class list. At some point if a class is certified, the Court and the Parties need to have a list of identifiable class members. Defendant argues that either there is no one-step way to tell whether a

---

[2] As in its earlier discovery responses and positions before the Court, Defendant employs lawyering language to put forward an incorrect fact. One example is at page 14 where it claims, ████████████████████████████████ ████████████████████████████  But none of the products at issue here are DDP products and every putative class member would be a person Defendant did in fact report as deceased.

person it reported as deceased is in fact deceased, or the Court should not consider any multi-step ways to tell that unless the Plaintiff detailed such options in response to Defendant's February 2024 interrogatory (which answer with consented enlargement would have been due only shortly before the April 15, 2024 class certification filing).

Defendant's position is largely—even though it may have defamed thousands of people and charged its customers for reports it claims are accurate, it cannot be held accountable because its records are inadequate to determine the identity of everyone it may have harmed. By very close analogy to LexisNexis, in *Souter III*, the Court rejected the same arguments as here:

> Equifax's protests ring especially hollow in light of its own substantial capabilities. As Souter noted, Equifax describes itself as a business that:
>
> [C]reates and delivers unparalleled customized insights that enrich both the performance of businesses and the lives of consumers through the comprehensive and differentiated data it manages, the expertise in advanced analytics it provides, the state-of-the-industry solutions it develops, and the leading-edge proprietary technology through which the solutions are delivered. The company organizes, assimilates and analyzes data on more than 600 million consumers and more than 80 million businesses worldwide and its databases include more than 200 million employee files.
>
> Pl.'s Reply at 12 (Docket No. 215) (citing http://www.equifax.com/about-equifax/company-profile (last visited Oct. 22, 2014)). In short, Equifax's very business model includes gathering and distilling information from a wide variety of sources in order to glean insights about individuals. The irony here presumably is not lost on Equifax, and certainly is not lost on the Court. In general, courts do not look favorably upon the argument that records a defendant treats as accurate for business purposes are not accurate enough to define a class. *See Herrera v. LCS Fin. Servs. Corp.,* 274 F.R.D. 666, 674 (N.D.Cal.2011) ("What was ascertainable to Ocwen in the course of adhering to its own policy is ascertainable for the purposes of identifying members of the class.").

*Souter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 197–98 (E.D. Va. 2015).

## A.    Defendant Concedes the Court Must Adapt the Class Definition if Necessary and Defendant Does Not State a Rule or Legal Basis to Bar Plaintiff's Responses and Contentions as to Ascertainability

Defendant's primary "ascertainability" argument is a repeat of its separate Motion in Limine. (ECF 245). Defendant is unhappy that when it at night on March 8, 2024 for the first time asserted a new ascertainability contention with new evidence, Plaintiff avoided it by simply narrowing the class to remove consumers over age 80 and added available state sources to answer the technical limitation Defendant belatedly asserted. The case has never changed—LexisNexis is governed by the FCRA.  It was obligated to follow reasonable procedures to ensure the maximum possible accuracy of its reports. It never follows any such procedures (zero by stipulation). Those reports inaccurately reported live persons as deceased. Rather than attempt a defense to that claim, Defendant bet everything on a gotcha sandbag strategy. But beyond the irony of Defendant's assertion of unfairness, LexisNexis also evidences a lack of basic understanding of Rule 23 and the purpose and flexibility of class certification. Defendant wants Plaintiff frozen to where she was for a proposed class definition on March 8 when Defendant created its new contentions.  But Rule 23 requires the Court to adapt, narrow and revise a requested or moved class to fit the facts and issues that arise on certification. In fact, while Defendant complains here about Plaintiff having suggested narrowing and the addition of state sources, Plaintiff could have just as well remained silent and let the Court impose the same narrowing and modifications.

In Defendant's Reply, this day filed, LexisNexis confirms a couple of points that also answer its arguments made at ECF 255. First, despite the direct challenge made in Plaintiff's opposition to the Motion in Limine, Defendant never even suggests a Rule or legal requirement to require the action it seeks therein at ECF 255. Not only does Defendant not make a Rule 37(c)(1) analysis, but Defendant does not even mention or ask for application of the Rule. (ECF 255 17-18).  Further, in the Motion in Limine Reply, Defendant fully abandons its argument also made at ECF 255 (at 18) that Plaintiff needed to amend the Complaint or formally modify the class

definition in other pleadings. (ECF 277 at 7). (In declaring that it would not respond to "Pl.'s Br. at 7-22" because it (incorrectly) believed this pertained to whether a plaintiff could freely propose and move on a modified class definition, but "this is not the issue before the Court on this motion[.]" (ECF 277 at 7). Defendant does not assert here (ECF 255) a Rule 37(c)(1) basis. There is no expired discovery cutoff date. (ECF 150). And Defendant does not anywhere now challenge the propriety of seeking certification on modified class definitions. It remains otherwise unclear the specific legal basis for Defendant's complaint and absent same, it is improper to consider a later argument to which Plaintiff was not afforded the opportunity to respond. Plaintiff understands Defendant's rhetorical complaints that "her new theory of ascertainability was never previously disclosed." She disagrees with much of that rhetoric. But regardless, where does Defendant establish a specific obligation to detail the contentions she would make on class certification? The demanded response to Defendant's last-minute discovery request was objected, and Defendant has not sought to even have a call or to commence a motion to compel. It cannot reasonably argue that it was prejudiced by not receiving responses—due by consent less than a month before April 15, 2024—sooner than April 15. Defendant received significant response time. And it could as well have continued discovery if it actually believed its argument correct.

Plaintiff does not further repeat most of the substantive arguments made in response to Defendant's collateral motion, and obviously still relies on them here.

## B.    Defendant's Inability to Produce Any, Let Alone a Predominant Number of Incorrectly Included (Deceased) Consumers is Dispositive of its Objection.

One argument in particular Plaintiff detailed in support of her own Motion in Limine (ECF 272) needs to be repeated here. LexisNexis present ascertainability arguments are the same made by other CRAs in clean liability cases using theoretical data criticisms. Every court known to the undersigned to consider circumstances as here—a CRA defendant comes up with theoretical

reasons why limitations on class data may cause the overinclusion of persons who do not meet the definition—has rejected the complaint absent tangible or actual evidence that such persons exist in large numbers. Defendant's strategy is the same as every other defense team opposing these FCRA cases. Equifax argued the same issues in *Soutter*, even the second time around with a post-appeal narrowed definition. *Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 196 (E.D. Va. 2015); *see also Patel v. Trans Union, LLC*, 308 F.R.D. 292, 302 (N.D. Cal. 2015); *Fernandez v. RentGrow, Inc.*, 341 F.R.D. 174, 208 (D. Md. 2022); *Rivera v. Equifax Info. Servs., LLC*, 341 F.R.D. 328, 345 (N.D. Ga. 2022). As here, those CRAs did not produce any actual instances of the data failure or establish that the Plaintiff's method of identification need not be "comprehensive." Instead, the court rejected such a requirement and found that where the defendant has not identified any instances of persons who should not be in the class, the class issues still predominate over the administrative burden of identification. The question is not whether the SSA DMF is perfect enough to meet Defendant's "comprehensive" standard, but rather whether the number of actual failures is significant and a "predominant number." As a sister District Court explained in rejecting the same theoretical arguments:

> The defendants' implied argument is that a significant number of the proposed class actually may have been accurately tagged as potential terrorists. **Absent some pretty significant proof to the contrary, the court is willing to assume that no significant (read: certification-breaking) fraction of the tagged proposed class** was in fact accurately tagged as potential terrorists. … The (undisputedly) problematic name-only logic and the sheer number of hits makes the court's **approach tolerable unless, again, the court is to start from the working assumption that a predominant number of class members tagged** with alerts, based on their names only, **were in fact accurately tagged** as potential terrorists.

*Patel*, 308 F.R.D. at 302 (bold added). Similarly, the District of Maryland rejected such theoretical challenges where, "RentGrow has not identified an individual who it believes is a match" and was not "certification-defeating" unless a "critical mass of accurately matched individuals."

*Fernandez*, 341 F.R.D. at 208-210. The court again followed the same standard, requiring to prevent certification, overinclusion of "a predominant number of the proposed class" that it saw "based on the record before it." *Id*. (quotation omitted); *see also Ramirez v. Trans Union, LLC*, 301 F.R.D. 408, 422 (N.D. Cal. 2014): ("The record before the Court does not support Trans Union's argument. Trans Union is unable to identify any instance in which a person it identified as a 'potential match' was in fact a match. Indeed, it has not identified a single instance in which the birth date of the person on the OFAC List and the 'potential match' matched, or even the address matched; in other words, in which there is something other than the person's name to suggest the person is on the OFAC List."); *Rivera*, 341 F.R.D. at 345 (Adopting these decisions where without proof of specific failures, there was not an 'overbroad class definition', which would be one of a "great many persons[.]") (cleaned up).

The point is that a defendant challenging the determination of class membership must do more that show that the class as defined is not "comprehensive" and could at that stage include greater than zero persons who should not be in the class. Rather, that number must be "great," "certification-defeating", a "critical mass of accurately matched individuals," and "a predominant number of the proposed class." Plaintiff has demonstrated in opening that she can identify a class. Defendant complains that there is still the possibility that some small number of individuals may have been accurately reported as deceased. Yet despite its full control over all of the data, and a year to develop and prove its hypothesis, including during the study it completed as a discovery compromise, LexisNexis has not even identified or proffered *even a single* example of this failing. The Court could simply rely on the earlier proposed definition—just the SSA data—and still satisfy Rule 23 based on Defendant's concession and dearth of actual evidence.

## C.    Defendant Overstates the Ascertainability Burden.

9

Historically, "Ascertainability" was used to avoid classes defined by amorphous and undeterminable or subjective criteria.

The purpose of the implied ascertainability requirement "is not to 'identify every class member at the time of certification,' but to define a class in such a way as to ensure that there will be some 'administratively feasible [way] for the court to determine whether a particular individual is a member' at some point." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 676 (2019) (quoting *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014)).

Both Fourth Circuits decisions cited by LexisNexis need to be considered on their facts, as the language in each can be used favorably by both sides here.

Most recently, the Fourth Circuit affirmed then District Judge Child's denial of class certification on multiple basis, including ascertainability. *Career Counseling, Inc v. AmeriFactors Fin. Grp., LLC*, 91 F.4th 202 (4th Cir. 2024). Examining the junk-fax (TCPA) case below, the outcome was obvious. There, the plaintiff Career Counseling presented facts showing that just 24,000 of the proposed class could be identified. However, unlike here, the opposing party submitted more than projections or qualitative criticisms, but rather concrete evidence and numbers and fact declarations from third parties showing that even those numbers were incorrect with at least thousands who could never be identified—the records did not exist. *Career Counseling, Inc. v. Amerifactors Fin. Grp., LLC*, No. 3:16-CV-03013-JMC, 2021 WL 3022677, at *12 (D.S.C. July 16, 2021), *aff'd,* 91 F.4th 202 (4th Cir. 2024).

*EQT* is equally reasonable and distinguishable. There, the Fourth Circuit stated this Circuit's understanding of ascertainability. "The plaintiffs need not be able to identify every class member at the time of certification. But "[i]f class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *EQT*, 764 F.3d at 358. There are two parts to meeting this burden. First, as *Career Counseling*

turned, there must exist somewhere data that can be obtained to objectively determine who is in the class.  Second, under *EQT*, the data itself must answer the question without separate factfinding or mini-trials. That is, once the data is obtained, the Court should not then have to make contested decisions as to the qualifying and contended facts. In *EQT*, the Circuit Court held that "the proposed classes raise serious ascertainability issues because they are defined to include both former and current gas estate owners." *EQT*, 764 F.3d at 359. Like here, the plaintiff proposed to identify by using available public records. For "current" owners, this was sufficient as class members will be easy to identify because the classes are all defined in reference to the ownership schedules[.]" *Id.* However, the Court had concerns about former owners, who while identifiable from land records could possibly require mini-trials. For those class members, "resolving ownership based on land records can be a complicated and individualized process" because "[a]s the record in this case highlights, numerous heirship, intestacy, and title-defect issues plague many of the potential class members' claims to the gas estate." *Id.* (cleaned up).  And even then, the Fourth Circuit did not find that those classes could not be ascertained. Instead, it ordered, "[o]n remand, the district court should reconsider the ascertainability issues posed by the ownership classes. At a minimum, the district court should endeavor to determine the number of potential class members who have obtained their interest in the gas estate after the defendants first prepared the ownership schedules." 764 F.3d at 360.

*EQT* is not the huge burden Defendant claims. And it cited for its foundation an earlier Fourth Circuit decision, *Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir. 1972), that rejected a defendant's ascertainability challenge on a definition more subjective and difficult than here. ("[A]ll citizens of South Carolina whose personal property has been subjected to 'claim and delivery' and those persons whose personal property will be claimed and delivered during the pendency of the federal action."). Recent decisions found ascertainability under *EQT* consistent

with the broader explanation stated here, with none beyond the justifiable *Career Counseling* case supporting denial of certification. *See e.g. Krakauer*, 925 F.3d at 658; *Peters v. Aetna Inc.*, 2 F.4th 199, 242 (4th Cir. 2021) (Reversing denial of class certification as abuse of discretion where "[t]he district court analyzed ascertainability and commonality too rigidly.")

Ms. Scroggins case is easier to decide than all of these. Defendant is really arguing as under *Career Counseling* that class membership cannot be ascertained because the data cannot be obtained. This is not an *EQT* issue, where mini-trials as to land rights, estate conflicts and other legal questions would have to be resolved individually. Here the only question is obviously objective: *Is the consumer now deceased*? Yes, there needs to be a way to know that. But there will never be a need for a mini-trial as under *EQT*. As this Court noted, "[t]he individualized fact-finding giving rise to mini-trials that defeat ascertainability are those requiring determinations on the merits—not an administrative review to determine whether an objective element of a class definition is met." *Souter*, 307 F.R.D. at 197.

**D. The Administrative Burden of Identifying Possible Deceased Class Members is Not Unreasonable Such to Defeat Superiority of a Class Remedy.**

In truth, Defendant's arguments are improperly cast as ascertainability. Its actual argument is a manageability issue to be considered in balancing relief and remedy for class members versus the administrative burden. *Mullins v. Direct Digital, LLC*, No. 15-1776, 2015 WL 4546159, at *3 (7th Cir. July 28, 2015). As such a superiority question, the burden of identifying the class is weighed against the burden of obtaining remedy for class members individually, a balance LexisNexis certainly loses. As the Court explained in *Souter II*,

> What Equifax is really arguing when it laments the burden imposed is manageability, not ascertainability. The difficulty and burden of such an undertaking are undoubtedly relevant to a manageability analysis under the superiority factor explored below. Unlike ascertainability, however, the manageability of adjudication by class is measured in relation to the manageability

> of adjudication by other means. As such, manageability should only be used to deny certification "where the attention and resources which would have to be devoted strictly to administrative matters will overwhelm any relief ultimately accruing to the plaintiff class." *Brown v. Cameron–Brown* Co., 92 F.R.D. 32, 49 (E.D.Va.1981) (citation omitted). And, that simply is not the case here.

*Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 197 (E.D. Va. 2015). In answering the Court's applicable reasoning in *Soutter*, LexisNexis ignores Judge Payne's explanations and legal precepts and simply suggests that the Court's caution that "The number of "steps" in the process and the time and effort required have no bearing on whether the individuals are or are not objectively ascertainable." *Id*. It suggests that maybe this resulted from the modest 1,000 person minimum in that class. That is certainly not a supported assumption. The *Soutter* docket of course shows that it was a minimum of 1,000, by stipulation, just as in this case Defendant has stipulated from its study to a number in the two-digit thousands. And though reversed on typicality grounds, the Court's original decision as to ascertainability for the entire class of tens of thousands was not a basis for reversal. *Soutter v. Equifax Info. Servs., LLC*, No. 3:10CV107, 2011 WL 1226025, at *6 (E.D. Va. Mar. 30, 2011), *rev'd and remanded on other grounds,* 498 F. App'x 260 (4th Cir. 2012) ("The degree of precision that Equifax attempts to place on Soutter in ascertaining class members simply is not required in order to certify a class.")

This is not an ascertainability issue and the Plaintiff has proffered multiple paths to identifying class members. On the record so far, there is no evidence of "predominant numbers" of deceased consumers in the class. Some SSA failures? Of course. But Defendant has offered no evidence for this group—those who were in LexisNexis' mainstream system and banking or doing ordinary business with its customers—of a "certification-breaking" number not within LexisNexis' SSA and State records data. The administrative burden here only comes when we have to look beyond LexisNexis' own data. That would be the small percentage that are not in the

accessible SSA data and not in the roughly 50% of the population for whom Defendant already obtains state records. Those other states – as Defendant conceded in its own Reply (ECF 277-1) – are responsive and cooperative, already providing preliminary information to expedite the process of identification after certification. *See e.g.* New Jersey Data Dictionary of Death Records Database Fields, attached as **Exhibit 1**; Washington State Death Record Files Layout, attached as **Exhibit 2**.[3]

### E. The File Disclosure Class is Easily Identified from Defendant's Own Data.

Defendant complains that identifying all of the class of consumers who requested and received a "Non-FCRA" disclosure would require manual review. First, that is misleading and an overstatement. As Plaintiff already established (and Defendant testified), most of these documents can be searched and reviewed electronically. Those that are not uniformly exportable in a database can be searched using conventional litigation document review. Regardless, this Court has repeatedly rejected such concern. In Soutter II, the CRA complained that identification from records "involve[d] several costly and time-consuming steps, requires some degree of manual review by Equifax employees[.]" Soutter*, 307 F.R.D. at 196.This Court cited *Dunnigan v. Metro. Life Ins. Co.,* 214 F.R.D. 125, 136 (S.D.N.Y.2003) ("[T]he class can be identified through an examination of the individual files of each of the participants. The fact that this manual process may be slow and burdensome cannot defeat the ascertainability requirement."). And it concluded that "this recourse to manual, member-by-member review" would not "render the inquiry 'subjective' because "most of the determinations are readily discernible and almost always binary:

---

[3] While Plaintiff had not intended to use these documents at this posture, but rather to avoid delay after certification, Defendant introduced these "Ten Documents" in Defense counsel's declaration. These are the documents to which she is referring, though more are coming in as Plaintiff's counsel clarifies and cooperates with these state sources.

an individual was either listed as subject to a judgment or was not; this judgment was either recorded by Equifax or was not; Equifax either received a communication from the individual or did not; and so on." *Id.* at 197.

**F. LexisNexis' Arguments Do Not Support Denial of Class Certification, But Instead simply Narrowing of the Class**.

In its opposition, Defendant picks at subsets of the proposed class, seeking to impress the Court with its definitional aptitude. But all Defendant does is isolate pockets of difficulty—SSA records are missing for consumers over age 100; LexisNexis does not have state records for more than half of consumers; certain product lines (though not those at issue here) do not offer sufficient archives to regenerate records of reporting. Plaintiff preempted these in opening and answered most herein. But at worst, and as conceded in Defendant's own Motion in Limine Reply (ECF 277), the Court should order a class definition to avoid such objectively-determinable outliers.

**III.    TYPICALITY**

Defendant ignores all of Plaintiff's opening argument. *See* ECF 230 at 23-25. And it hardly mentions the law. As already established, "to determine if [Plaintiff] has shown typicality, we compare her claims and [LexisNexis]'s defenses to her claims with those of purported class members by reviewing the elements of [Plaintiff's] prima facie case and the fact supporting those elements and examining 'the extent' to which those facts 'would also prove the claims of the absent class members.'" *Soutter v. Equifax Info. Servs., LLC,* 498 F. App'x 260, 265 (4th Cir. 2012). Plaintiff applies Defendant's objections to that standard.

Plaintiff is a member of a class of consumers about whom Defendant sold a report it contended was not FCRA-governed, that inaccurately reported the consumer as deceased. Defendant now claims that she is not a member of such a class because it sold a product it named "Instant Verify" and not a product it named "Instant ID." This is an immaterial dispute and one

that if mistaken would be addressed easily enough by inclusion of both products within the class

definition.  This argument does demonstrate the difficulty faced in litigating this case oppose

LexisNexis.  Its original discovery responses, continuing into 2024 and even Declarations named

"Instant ID" as the family of product sold regarding Ms. Scroggins.  See e.g. ECF 39-3 Decl. Joe

Preza); Ex. 3, Def.'s Oct. 24, 2023 Resp. to Pl.'s Interrog. 4 ███████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████ And yet, it now claims via

its belated March 8, 2024 new answer to Interrogatory 11 something different.

Regardless, the definition should include both Instant ID and Instant Verify as they are

functionally the same.  Ex. 4,  Dep. of Cindy Vaughn, 8:8-16 ██████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████ 9:5-

9 (████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

The second contention is that Plaintiff's claim is atypical because her report was not used

for eligibility purposes. (ECF 255 at 26). Plaintiff is unsure what Defendant is arguing. The class

consists only of consumers who were the subject of specific reports that Defendant expressly

claims were not used for eligibility purposes. See e.g. ECF 255 at 42, n.5.  In fact, every class

member is in the same circumstance—their information is being used to verify who they are in

order to approve or advance a credit transaction, but LexisNexis is refusing to follow procedures to ensure the reporting is accurate. But that is not the larger point in response. Instead, Defendant assumes without argument (again) that the specific use of a single report is determinative of whether it is FCRA-governed. Plaintiff already established otherwise and rather than answer the legal arguments made, Defendant defaults the issue of whether FCRA-governance is a common issue. ECF 230 at 17-22. And it largely leaves unanswered the facts cited on this point.  ECF 230 at 2-4. Defendant acknowledges that it sells reports for both eligibility and non-eligibility purposes.  In fact, that is apparently the gist of its first typicality argument. By analogy, if Equifax sells a conventional credit report to a lender for a mortgage application, but sells the same report to a consumer's neighbor for unlawful snooping, both reports are still FCRA governed. The same is true here. And the data having been collected and maintained for dual purposes yields the same result. But more critically, the Defendant stipulated that it did not follow any FCRA procedures and will not contend otherwise. And the report of every consumer class member inaccurately reported him or her as deceased.  Those are the liability questions:  Is Defendant a CRA?  Did the reports it sold contain information collected in whole or in part, or expected to be used in whole or in part, for a FCRA purpose? Did they regard a specific consumer? Were they inaccurate?  These are the contested liability issues (Defendant having stipulated the "reasonable procedures" element). Whether a specific individual report itself was for a lawful purpose is meaningless to these liability questions.

Defendant's third typicality assertion, labeled "different products and all sources," is misleading because that's not what it is arguing. (ECF 255 at 27-28) Instead, Defendant argues that compliance procedures for the FCRA, § 1681e(b), will vary among class members. However, as Plaintiff notes below regarding predominance, Defendant must be estopped from making such

claims. First, there is no evidence of differing rules, reliability, or procedures for different sources or litigated products. From the start, Plaintiff has argued that there are no material differences in Defendant's FCRA procedures. During discovery, Plaintiff demanded that Defendant disclose any such differences and produce the varied procedures. LexisNexis refused to produce or identify any FCRA compliance procedures whatsoever. The arguments presented in Defendant's opposition brief are entirely new. Anticipating this shift due to the lack of other opposition points, Plaintiff has moved to exclude this contention in her Memorandum in Support of her Motion in Limine (ECF 206 at 17-18.) She relies here on that same argument and evidence. Simply put, Defendant is necessarily estopped from arguing that it has procedures that are "reasonable" or otherwise comply with the FCRA when it has stipulated on the record and in a verified Interrogatory response that it has zero such procedures. (ECF 115 at 2; ECF 210 at 7–8.)   Further, Plaintiff has already established that there were no material differences between products. And even now in its opposition, Defendant does not attempt to offer is own evidence to support these supposed differences.   The only material fact is that Defendant has followed zero procedures to ensure maximum possible accuracy and has stipulated to that fact. The elements of Plaintiff's claim will be identical to, and certainly typical of the same claim for the class.

As its fourth Typicality objection, Defendant avers that Plaintiff's claim is not typical because it was "accurate within the meaning of the FCRA."  (ECF 255 at 28-29).  The reporting of a consumer who is alive as deceased is not accurate. Not for the Plaintiff. Not for anyone in the Class. This is the same argument LexisNexis contrives as to Predominance. Defendant's argument there is longer and modestly more developed.  Plaintiff adopts her reply arguments made to this argument as below.

Finally, Defendant suggests that Plaintiff is seeking damages on her own that are atypical of those she is seeking for the Class. This is untrue. Plaintiff has sought certification of and is pursuing claims for the Class only under Counts One and Two.  She separately has an individual claim under 15 U.S.C. § 1681i. She is not prosecuting this separate violation as a class claim. She has stated previously and she states here again that she will not seek any damages under the individual claim that would bind the Class. The undersigned has never seen this argument made as a Typicality objection. It is more commonly made as to Adequacy. Defendant does not explain how it would apply to the former and does not object as to the latter.

**PREDOMINANCE**

Defendant challenges Rule 23(b)(3)'s predominance requirement by identifying seven issues it contends are individualized. (ECF 255 at 26-39.) Several are not individual issues, but even if so, why does the existence of individual issues matter? Plaintiff identified substantial common issues in addressing Rule 23(a)(2) commonality, to which argument Defendant never responds. (ECF 230 at 16-23.) The Court need not be convinced that no individual issues exist, but instead, must simply find that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Defendant ignores this standard generally and Plaintiff's statement of law specifically. *See* ECF 230 at 27.

The predominance requirement is meant to assess whether the class's interests are "sufficiently cohesive to warrant adjudication by representation." 2 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 4:49 (6th ed.)."Predominance therefore asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.*

Plaintiff has identified several critical common issues that are more dispositive than those highlighted by Defendant. (ECF 230 at 16-23.)[4]

An individualized issue matters only where a factfinder would have to decide an uncertain, subjective and controverted point. The predominance requirement "is not a numerical test that identifies every issue in the suit as suitable for either common or individual treatment and determines whether common questions predominate by examining the resulting balance on the scale" but, rather a "single common issue may be the overriding one in the litigation, despite the fact that the suit also entails numerous remaining individual questions." § 4:51. The predominance requirement—Five rules in ascertaining predominance, 2 Newberg and Rubenstein on Class Actions § 4:51 (6th ed.); s*ee also Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 214 (E.D. Va. 2015) ("This is not simply a matter of counting common versus noncommon questions and checking the final tally. "Rule 23(b)(3)'s commonality-predominance test is qualitative rather than quantitative." *Stillmock v. Weis Markets, Inc*., 385 F. App'x 267, 272 (4th Cir. 2010) (citing *Gunnells,* 348 F.3d at 429). In other words, Rule 23(b)(3) "compares the quality of the common questions to those of the noncommon questions." *Newberg* § 3:27.")

No matter what individual issues Defendant suggests, in a FCRA case as here, "the qualitatively overarching issue by far" will be "the liability issue of the defendant's willfulness, and the purported class members were exposed to the same risk of harm every time the defendant violated the statute in the identical manner[.]" *Stillmock*, 385 F. App'x at 273. This Court has repeatedly agreed in rejecting as less dominant than liability a long list of defense-proffered

---

[4] "The fact that an issue is conceded or otherwise resolved does not mean that it ceases to be an 'issue' for the purposes of predominance analysis." *In re Nassau County Strip Search Cases*, 461 F.3d 219, 228 (2d Cir. 2006) (*citing Waste Management Holdings, Inc. v. Mowbray*, 208 F.3d 288, 299, 46 Fed. R. Serv. 3d 1019 (1st Cir. 2000)).

"individual issues." *See*, *e.g.*, *Berry v. LexisNexis Risk & Info. Analytics Grp., Inc.*, No. 3:11-CV-754, 2014 WL 4403524, at *13 (E.D. Va. Sept. 5, 2014), *aff'd sub nom. Berry v. Schulman*, 807 F.3d 600 (4th Cir. 2015); *Williams v. LexisNexis Risk Mgmt. Inc.*, No. CIV A 306CV241, 2007 WL 2439463, at *6 (E.D. Va. Aug. 23, 2007); *Clark v. Trans Union, LLC*, No. 3:15CV391, 2017 WL 814252, at *15 (E.D. Va. Mar. 1, 2017); *Henderson v. Trans Union LLC*, No. 3:14-CV-00679-JAG, 2016 WL 2344786, at *5 (E.D. Va. May 3, 2016); *Souter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 216 (E.D. Va. 2015). As the Court has repeatedly found, a determination that Defendant's standard procedure, for example here LexisNexis' treatment of its data as non-FCRA governed, violated the FCRA overwhelms the administrative hassle of checking whether each individual class member is alive. No trial would be necessary. Not even a summary judgment motion. If the consumer is not alive there will be an incontrovertible record of that fact.

Consistent with its handling of Plaintiff's opening, LexisNexis largely ignores all of the analysis, evidence and cites regarding commonality and predominance. For example, Plaintiff details and provides a developed legal argument regarding whether FCRA-governance is determined by the particular use or a specific report. (ECF 230 at 18–23.). Defendant never writes a word about this major section of Plaintiff's opening, instead simply stating without any law or analysis, "Resolution of those questions would require individualized inquiry of each transaction and LNRS FL report associated with each putative class member." (ECF 255 at 30.). Why? If Defendant regularly sells consumer reports, it is a CRA. If it regularly sells reports containing information bearing on the FCRA factors, it is a CRA. If the reports its sells contain information that was collected in whole *or in part* for later use in acknowledged FCRA reports, all reports containing such information are consumer reports. (ECF 230 at 18–23). Plaintiff does not repeat the lengthy and unrebutted explanation she has already made.

21

Defendant also somehow argues that accuracy *in this case* is an individual issue. Plaintiff contends that it is inaccurate to report a live person as deceased.  In response, Defendant misapplies law to contend that accuracy is user determined, that is that information is only inaccurate if the recipient also then takes adverse action upon it. (ECF 255 at 31-32). That is not now and has never been the law. "Determining inaccuracy constitutes a common question. *See supra* at 200–01. Inaccuracy is a principal element of the class claim and its commonality weighs in favor of class certification under the predominance inquiry." *Souter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 214 (E.D. Va. 2015).

The first part of Defendant's "accuracy" argument contends that "assessing accuracy would first require a determination as to how the LNRS FL customer(s) associated with a particular class member searched for their information." (ECF 255 at 33). Respectfully, the undersigned has no idea what Defendant is therein arguing. Yes, LexisNexis performs searches where the customer provides a SSN, and also still searches if the customer does not provide a SSN.  Regardless, as to every putative class member, definitionally the consumer was alive but reported as deceased. Maybe Defendant is trying to argue that its procedures to match results are different for some reports—an argument is makes below. Still, this is not an accuracy question. There is not likely any solution to Plaintiff's confusion here, as Defendant still argues that, "LNRS FL's report was accurate, because it was true that "the individual located [i.e., Plaintiff] with the information [CFCU] provided [was] reported to be deceased." (ECF 255 at 33-34.) Defendant is arguing that when Call FCU sent LexisNexis a request for a report as to whether or not Kerry Scroggins was deceased, Defendant accurately reported that the very alive Plaintiff was deceased. She plainly was not.

Defendant also asserts that accuracy is individualized because the Court would first need to decide if the user took an adverse action against the consumer based on that inaccurate report. This is certainly not the law. This defense argument seems to restate the "causation" argument is makes below. A consumer report's accuracy is not dependent on specific use for that report, but rather whether the item is categorically inaccurate. *Bibbs v. Trans Union L.L.C.*, 43 F.4th 331, 341–342 (3d Cir. 2022) (report must be viewed from perspective of "reasonable user"); *Alexander v. Moore & Assocs., Inc.*, 553 F. Supp. 948 (D.C. Haw. 1982) (court considered "the potential that the information will create a misleading impression against the availability of more accurate information"). There is no doubt that reporting a live person as deceased is by itself a "significant inaccuracy." *Gohman v. Equifax Info. Servs., LLC*, 395 F. Supp. 2d 822, 827 (D. Minn. 2005).[5] Defendant itself cites an Eleventh Circuit decision, *Erickson v. First Advantage Background Servs. Corp.*, 981 F.3d 1246, 1252 (11th Cir. 2020), which directly rebuts the point it here tries to make. LexisNexis is arguing that accuracy as to a specific class member's report will require a determination of how the specific LexisNexis customer who obtained that specific report acted upon it. But as *Erickson* notes, "accuracy" means "freedom from mistake or error." (citing *Webster's Third New International Dictionary* 13; *see also American Heritage Dictionary* 9 ("[e]xactness; correctness").). *Id.* at 1251-52. That determination of "whether a report is misleading is an objective measure." *Id.*

More importantly, neither of the leading decisions in this Circuit on "accuracy" suggest anything other than that accuracy is objectively determined. *Dalton v. Cap. Associated Indus., Inc.*,

---

[5] Defendant's pattern in taking extreme legal positions is also reflected in its assertion that Call FCU never took an adverse action against Ms. Scroggins. Plaintiff need not allege that and this is not an element of her § 1681e(b) or 1681g(a) claims, but certainly the credit union's refusal to allow Plaintiff to access her accounts other than at a distant branch was adverse.

257 F.3d 409, 416 (4th Cir. 2001) ("CAI argues that the report is accurate because it does not explicitly state that Dalton was guilty of a felony. However, a reasonable jury could read the report as plainly indicating that Dalton was found guilty of a felony, third degree assault."); *Saunders v. Branch Banking And Tr. Co. Of VA*, 526 F.3d 142, 148 (4th Cir. 2008) (substantive analysis of accuracy with no mention of requirement that it have been acted upon by plaintiff's creditor).

Defendant's third individualized issue is supposedly whether its § 1681e(b) compliance procedures violated the statute. According to LexisNexis, there are "[d]ifferences in LNRS FL's matching and ingestion rules" that present "individualized issues." (ECF 255 at 36-37.) There are not. First, as raised above for Typicality, there is no evidence of differing matching procedures or any other FCRA procedures because LexisNexis refused to produce or identify any. Everything the Court is reading in the opposition brief on same is brand new. Plaintiff has already anticipated this shift given the dearth of other opposition points and has moved for the exclusion of this contention in her Motion in Limine. (ECF 206 at 17-18.) She relies here on that same argument and evidence. Simply put, Defendant is necessarily estopped from arguing that it has procedures that are "reasonable" or otherwise comply with the FCRA when it has stipulated on the record and in a verified Interrogatory response that it has zero such procedures. (ECF 115 at 2; ECF 210 at 7-8.)

Defendant asserts that standing is an individualized issue for the Disclosure Class. Yet Defendant entirely ignores and never addresses Plaintiff's argument to the contrary. (ECF 230 at 28-29). Plaintiff does not repeat the same legal framework or explanation and of course relies on her opening. Defendant asserts as to the Disclosure Class that Plaintiff's class definition ignores that some individuals who "requested an Accurint or other Non-FCRA file disclosure" also requested and received an FCRA file disclosure from LNRS which contained this very

information." (ECF 255 at 35). But there are no such persons or reports that provided the same information in both the acknowledged FCRA reports and Accurint disclosures. Defendant stipulated to such fact and as above, Plaintiff relies on her Motion in Limine. Defendant conceded that its Accurint disclosures do not have the sources of Accurint data and do not have inquiries. Regardless, if there are such consumers, they can be removed from the class definition. The modest additional administrative burden of comparing FCRA and non-FCRA disclosures is not a predominant issue. As the Court has explained:

> Common issues will predominate if individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria— thus rendering unnecessary an evidentiary hearing on each claim.

*Soutter v. Equifax Information Services, LLC*, 307 F.R.D. 183, 214 (E.D. Va. 2015).

Defendant's fifth "individualized issue" is causation, based on its unexplained understanding of a case in which the consumer had sought actual damages. (ECF 255 at 36). That case used the word causation, though it did so in a discussion of actual damages. Here, for the class claims, §§ 1681e(b) and 1681g(a), the Plaintiff has alleged a willful violation and is seeking only statutory and punitive damages. There is no such causation requirement. *Williams v. LexisNexis Risk Mgmt. Inc.*, No. CIV A 306CV241, 2007 WL 2439463, at *6–7 (E.D. Va. Aug. 23, 2007) ("LexisNexis argues that individual issues of causation would predominate in the litigation. This argument misapprehends Plaintiffs' theories of relief. Were Plaintiffs seeking actual damages, LexisNexis' argument would be well-taken. However, Plaintiffs are seeking only punitive and statutory damages, neither of which require a showing of individual harm . . . . Thus, whether a LexisNexis violation of the FCRA caused any class member to suffer harm is irrelevant to the litigation."); *McIntyre v. RealPage, Inc.*, 336 F.R.D. 422, 438 (E.D. Pa. 2020) ("Hypothetical individualized errors from one report to the next, however, have no bearing on the key liability inquiry in this case. Plaintiff alleges that Defendant should not have taken LexisNexis data at face

value and use it in its own reports, without first performing its own independent assessment of that data. Thus, liability does not turn on the reasonableness of the error(s) in the individual tenant applicant's reports, but rather on the reasonableness of Defendant's collection practice, policy, and procedure that produced the error rate giving rise to the class' claim.); *see also Stillmock*, 385 F. App'x at 273 (rejecting predominance argument based on individualized statutory damage questions).

Similarly, Defendant contends that statutory damages have individuated elements. (ECF 39). Controlling case law rejects this contention. *Stillmock* expressly rejected it. Numerous cases in this District (including in this court room) have rejected it. Even the *Souter* decision Defendant cites for its point rejected it. *Souter v. Equifax Info. Servs., LLC*, No. 3:10CV107, 2011 WL 1226025, at *14 (E.D. Va. Mar. 30, 2011), *rev'd and remanded,* 498 F. App'x 260 (4th Cir. 2012). Most remarkable is that the *Berry* case of which Defendant cannot stop writing expressly survived appeal because of the ease of establishing statutory damages. The Court of Appeals explained,

> When it comes to statutory damages under the FCRA, what matters is the conduct of the *defendant,* Lexis—which, as the district court emphasized, "was uniform with respect to each of the class members." *Id.* at *12. The availability of statutory damages in this case, in other words, is a simple function of Lexis's policies with respect to its Accurint reports, applicable to the entire (b)(2) Class.[4] If Lexis unreasonably failed to treat Accurint reports as "consumer reports" subject to the FCRA, then every class member would be entitled uniformly to the same amount of statutory damages, set by rote calculation. *Id.*

*Berry v. Schulman*, 807 F.3d 600, 609–10 (4th Cir. 2015).

Finally, Defendant's seventh "individualized issue" is FCRA willfulness, an issue every decision known to the undersigned held exactly the opposite as Defendant avers. Defendant argues that the rejection of its "*Safeco* means qualified immunity" interpretation means that the question of willfulness will be "subjective." (ECF 255 at 40-42). But this does not turn the question into an individualized issue. "Subjective" means that you look to what the specific defendant – here

LexisNexis—actually read the statute to mean. Defendant agrees that *Safeco* held that "recklessness turns on what the defendant knew or had reason to know." (ECF 255 at 41.)  All of the "facts" that the Court would have to determine (*Id*. at 41-42), regard what Defendant knew and did. None involve class members. That is the reason "willfulness" (whether *Berry*, *Safeco* or anything else) is a common issue. It is common to the entire class. (*See* ECF 230 at 17-18, 23 and case cited therein.)

What Defendant is really doing is repeating what it characterized as its "ascertainability" argument. Defendant cannot in good faith argue that whether it is accurate to report a deceased person (though it still tries). Instead, its primary predominance argument as to accuracy is again that it would be time-consuming to determine whether a potential class member is in fact alive. This may take time and effort. But as the Court has explained:

> Common issues will predominate if individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria—thus rendering unnecessary an evidentiary hearing on each claim.

*Soutter v. Equifax Information Services, LLC*, 307 F.R.D. 183, 214 (E.D. Va. 2015). In fact, Defendant concedes, "show[ing] that persons for whom a deceased indicator was returned by LNRS FL are alive" may be "an easy task in an individual case[.]". (ECF 255 at 16-17). What LexisNexis is arguing is that performing that confirmation that a class member is alive for a larger group of people will take more time. But on the issue of predominance, that is not the question.

Thee predominate common questions include whether Defendant's reports fall within the FCRA's definition of consumer report and whether Defendants' conduct was willful. Even the determination of appropriate statutory damages constitutes a common question under these circumstances, because "the qualitatively overarching issue[s]" are the Defendants' willfulness and the applicability of the FCRA to Defendants's reports. *Stillmock,* 385 F. App'x at 273. Because "the purported class members were exposed to the same risk of harm every time the defendant

violated the statute in the identical manner, the individual statutory damages issues are insufficient to defeat class certification under Rule 23(b)(3)." *Id.; accord Ealy v. Pinkerton Gov't Servs.,* 514 Fed. Appx. 299, 305 (4th Cir.2013). *Berry v. LexisNexis Risk & Info. Analytics Grp., Inc.*, No. 3:11-CV-754, 2014 WL 4403524, at *13 (E.D. Va. Sept. 5, 2014), *aff'd sub nom. Berry v. Schulman*, 807 F.3d 600 (4th Cir. 2015).

The twelve reports LexisNexis furnished in response to inquiries about the Plaintiff were inaccurate in the identical way that the reports of each putative class member were inaccurate. By nature of the narrowed class definition, every putative class member is in the exact same circumstance: Defendant furnished a report about each putative class member stating that he or she was deceased. "Accuracy" is clearly a common question: is it inaccurate to say that a live person is deceased?

Defendant's argument is common in such cases.  In *Souter*, for example, Equifax asserted that whether a judgment was or was not satisfied was the key accuracy question. The Court rejected the same argument as here, concluding, "The relevant question is whether the inaccuracy alleged is capable of resolution by common answer. It is." *Souter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 201 (E.D. Va. 2015). LexisNexis incorrectly suggests a rule of law that accuracy is an individualized question. It is not. *Ramirez v. Trans Union, LLC*, 301 F.R.D. 408, 422 (N.D. Cal. 2014) (But even those cases do not hold that the issue of accuracy in a FCRA claim always defeats certification. *See, e.g., Owner–Operator Independent Drivers Ass'n, Inc. v. USIS Commercial Services, Inc.,* 537 F.3d 1184, 1194 (10th Cir.2008) ("whether a report is accurate *may* involve an individualized inquiry") (emphasis added). *Farmer v. Phillips Agency, Inc.,* 285 F.R.D. 688 (N.D. Ga. 2012), involved a challenge to inaccurate and incomplete criminal background reports prepared by the defendant. *Id.* at 690.")

## IV.    SUPERIORITY

Defendant briefly challenged the superiority of class certification with two arguments. First, citing a 2007 Pennsylvania case, it asserts that the FCRA's damage remedies make individual litigation superior. (ECF 255 at 43). Additionally, Defendant references an unrelated out-of-Circuit case that includes dicta criticizing the appellee for not explaining how individual issues would not predominate at trial. *Id.*

Plaintiff has addressed superiority on opening and LexisNexis follows form in ignoring every cite and argument presented. To the undersigned's knowledge, not one FCRA case from this District or Circuit has found as Defendant hopes. It remains frustrating that the same defense teams repeat the same arguments without ever accepting this wall of precedent. Nearly every such FCRA case has found class certification superior to no remedy at all (the result for 99%+ of the class) or hundreds of individual cases.[6] Regardless, here Class members do not even know LexisNexis exists, let alone that they have claims against it or even that it is the source of the difficulties they are facing. How exactly does LexisNexis, in good faith, argue that these thousands of consumers being left on their own to pursue individual federal lawsuits in a complex field with no knowledge is superior to anyone or anything besides the Defendant?

## V.    CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff's Motion and certify the classes defined in her Motion.

---

[6] *See e.g. Stillmock v. Weis Markets, Inc*., 385 F. App'x. at 274-75; *Berry v. LexisNexis Risk & Info. Analytics Grp., Inc.*, No. 3:11-CV-754, 2014 WL 4403524, at *13 (E.D. Va. Sept. 5, 2014), *aff'd sub nom. Berry v. Schulman*, 807 F.3d 600 (4th Cir. 2015); *Williams v. LexisNexis Risk Mgmt. Inc*., CIV A 306CV241, 2007 WL 2439463, at *9 (E.D. Va. Aug. 23, 2007); *Clark v. Trans Union, LLC*, No. 3:15CV391, 2017 WL 814252, at *16 (E.D. Va. Mar. 1, 2017); *Thomas v. FTS USA, LLC*, 312 F.R.D. 407, 425-426 (E.D. Va. 2016); *Henderson v. Trans Union LLC*, No. 3:14-CV-00679-JAG, 2016 WL 2344786, at *5 (E.D. Va. May 3, 2016); *Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 217 (E.D. Va. 2015).

Dated: June 28, 2024

Respectfully submitted,

**KERRY JENNIFER SCROGGINS**

By____*/s/ Leonard A. Bennett*_____
Leonard A. Bennett, VSB #37523
Craig C. Marchiando, VSB #89736
Adam Short, VSB #98844
John J. Maravalli, VSB #99000
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA  23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
Email: craig@clalegal.com
Email: adam@clalegal.com
Email: john@clalegal.com

Drew D. Sarrett, VSB #81658
**CONSUMER LITIGATION ASSOCIATES, P.C.**
626 E. Broad Street, Suite 300
Richmond, Virginia 23219
Phone: (804) 905-9900
Facsimile: (757) 930-3662
Email: drew@clalegal.com

*Counsel for Plaintiff*